James **EATON** and Steve Seidlitz, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**ONAN CORPORATION**, The Pension Policy Committee of Cummins Engine Company, Inc., Onan Pension Plan, and Onan Profit Sharing Plan, Defendants.

No. IP 97–0814–C–H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 29, 2000.

William C. Barnard, Sommer & Barnard, Indianapolis, IN.

William K. Carr, Denver, CO.

Robert F. Hill, Hill & Robbins, Denver, CO.

Arthur P. Kalleres & Marc Sciscoe, Ice Miller, Indianapolis, IN.

### ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

Like many employers in recent years, defendant Onan Corporation converted its defined benefit retirement plan to a design

known as a "cash balance" design. In this case, Onan employees and retirees have raised a claim of age discrimination that could result in a finding that cash balance plans are essentially *per se* illegal. The question is one of first impression in the courts: whether a cash balance defined benefit pension plan violates federal prohibitions on age discrimination in pension plans on the theory that the "rate of benefit accrual" declines with an employee's age. See 29 U.S.C. § 623(i) (for defined benefit plans, prohibiting "cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age") & 29 U.S.C. § 1054(b)(1)(H) (defined benefit plan violates law if "an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age"). That question has been left unanswered by the Internal Revenue Service and the Equal Employment Opportunity Commission since the relevant statutory language was enacted in 1986. As explained below, the court finds that the cash balance plan at issue here does not violate those prohibitions on age discrimination in terms of the rate of benefit accrual. Plaintiffs have also raised a number of related claims more specific to the particular plan in this case, three of which cannot be resolved as a matter of law on the parties' motions for summary judgment.

## I. *Background and Summary*

Plaintiffs here are participants in the Onan Pension Plan sponsored by defendant Onan Corporation, a wholly-owned subsidiary of Cummins Engine Company, Inc. Plaintiffs assert claims under the Age Discrimination In Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, against defendant Onan Corporation, and under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, against defendants Onan Corporation, the Pension Policy Committee of Cummins Engine Company, Inc., the Onan Pension Plan, and the Onan Profit Sharing Plan.

On December 14, 1994, the Onan board of directors formally amended and "restated" the Onan Pension Plan, retroactive to January 1, 1989, adopting what is known as a cash balance pension plan design. Plaintiffs assert that Onan has violated the ADEA, first by establishing and maintaining a cash balance pension plan that reduces the rate of a participant's benefit accrual because of age, and second by providing alternative formulas for annuities under the Pension Plan without offering an equivalent lump sum payment as an optional form of benefit.

Plaintiffs also contend that the Onan Pension Plan's rate of benefit accrual violates ERISA because a participant's rate of benefit accrual decreases based on a participant's age, because some forms of benefits are payable only as annuities and not as lump sums, because the accrual of benefits is excessively "backloaded," and because defendants failed to use reasonable actuarial factors in determining participants' offset amounts under the Onan Profit Sharing Plan.

Defendants have moved for summary judgment on all of plaintiffs' claims. Plaintiffs have moved for summary judgment as to liability on their age discrimination claims on the rate of benefit accrual issue under both the ADEA and ERISA, and on their claims regarding lump sum distributions under ERISA, 29 U.S.C. §§ 1053 & 1055.

For two reasons, the court finds as a matter of law that the cash balance design of the Onan Pension Plan does not violate the age discrimination provisions on the rate of benefit accrual in the ADEA, 29 U.S.C. § 623(i), or ERISA, 29 U.S.C. § 1054(b)(1)(H). First, the legislative history shows that these specific prohibitions do not apply at all to employees who have not yet reached normal retirement age. Accrual of benefits for these younger employees is regulated by other provisions of ERISA. Second, even assuming these pension age discrimination provisions ap-

ply at all to participants who have not reached normal retirement age, when their language is properly applied to cash balance pension plans, the undisputed facts show that the rate of benefit accrual does not depend on age. The court also finds as a matter of law that the Onan Pension Plan does not discriminate on the basis of age by failing to provide for a lump sum payment option for all alternative formulas for calculating an annuity benefit. The court therefore grants summary judgment for defendants on these claims and denies plaintiffs' motion for summary judgment on these claims.

In light of very recent decisions of the Second and Eleventh Circuits interpreting 29 U.S.C. § 1053(e), however, the court denies both sides' motions for summary judgment on the question whether ERISA requires the Onan Pension Plan to offer payment of benefits based on the so-called "minimum annuity" and "grandfather annuity" in the form of a lump sum payment that is the actuarial equivalent of the applicable annuity. See *Esden v. Bank of Boston,* 229 F.3d 154, 161 (2d Cir.2000); *Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan,* 221 F.3d 1235, 1251 (11th Cir.2000). These recent decisions may call for the creation of subclasses of plaintiffs based on the effects of 1994 legislation. There are also issues regarding the availability and extent of retroactive relief for participants who have chosen to take benefits in the form of annuities rather than lump sum distributions.

The court also is not persuaded that defendants are entitled to summary judgment on two additional issues. The first is whether the Onan Pension Plan violates the "anti-backloading" benefit accrual requirements of ERISA. The second is whether Onan could properly use two different interest rates when calculating opening account balances for participants who had also participated in the Profit Sharing Plan. Defendants' motion for summary judgment on ERISA claims is denied on those claims.

## II. Cash Balance Pension Plans

In general, federal law recognizes two types of pension plans provided by employers: defined benefit plans and defined contribution plans. In a defined benefit plan, a plan participant is entitled to a fixed periodic benefit payment upon retirement. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 439, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999), citing *Commissioner v. Keystone Consolidated Industries, Inc.,* 508 U.S. 152, 154, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993). Benefits are paid to plan participants pursuant to a formula spelled out in the pension plan. Defined benefit plans are usually funded by the employer on an actuarial basis, which is supposed to ensure that the plan will have adequate funds to pay the benefits promised to plan participants when they reach retirement age. Because a defined benefit plan "consists of a general pool of assets rather than individual dedicated accounts," the employer "typically bears the entire investment risk and ... must cover any underfunding as the result of a shortfall that may occur from the plan's investments." *Hughes Aircraft,* 525 U.S. at 439, 119 S.Ct. 755.

Until recently, the benefit formulas in defined benefit plans typically have been based on a percentage of the participant's salary over the last year or several years before retirement, multiplied by the participant's years of service with the employer. That design assumes that most employees' compensation is highest near the end of their careers, so an employee usually earns the largest share of a retirement benefit near the end of his or her career. Thus, such a plan rewards long-term employment and loyalty. Some pension practitioners refer to this as a "backloaded" accrual of benefits. See generally Alvin D. Lurie, *Cash Balance Plans: Enigma Variations,* Tax Notes Today (Oct. 25, 1999) (electronic publication).

In contrast, a defined contribution plan establishes an individual account for each participant. The employer may make periodic contributions to the participant's individual plan account (often supplemented by voluntary contributions by the participant). The participant's retirement benefit is determined by the balance in the individual account, which will depend on the contributions plus net investment earnings on the contributions. See 29 U.S.C. § 1002(23)(B) (defining a participant's accrued benefit in a defined contribution account as "the balance of the individual's account"). Because a participant's retirement benefit is not a fixed amount, the participant bears the investment risk. Defined contribution plans generally do not have the "backloading" problem found in many defined benefit plans. The benefits in a defined contribution plan are a function of contributions and investment earnings over an entire career with an employer, not primarily just the last year or last few years. See generally *The Controversy Over Cash Balance Plans*, 158 N.J.L.J. 652 (Nov. 22, 1999).

Cash balance plans are defined benefit plans that strongly resemble defined contribution plans. See generally *Esden v. Bank of Boston*, 229 F.3d 154, 176 (2d Cir.2000) (describing cash balance plans). The IRS has described cash balance plans as follows:

In general terms, a cash balance plan is a defined benefit pension plan that defines benefits for each employee by reference to the amount of the employee's hypothetical account balance. An employee's hypothetical account balance is credited with hypothetical allocations and hypothetical earnings determined under a formula selected by the employer and set forth in the plan. These hypothetical allocations and hypothetical earnings are designed to mimic the allocations of actual contributions and actual earnings to an employee's account that would occur under a defined contribution plan. Cash balance plans often specify that hypothetical earnings (referred to in this notice as interest credits) are determined using an interest rate or rate of return under a variable outside index (*e.g.*, the annual yield on one-year Treasury securities).

IRS Notice 96–8, 1996–1 C.B. 359 (Feb. 5, 1996). Because cash balance plans provide that an individual's account will receive interest credits that are outside the control of the employer, the employer bears the risk that the plan's investment return may fall below the interest credit rate guaranteed by the plan. Similarly, the employer benefits if the plan's net investment return is above the rate guaranteed by the plan.[1]

From an economic standpoint, a cash balance pension plan is something of a hybrid between a defined benefit and defined contribution pension plan. By legal definition, however, a cash balance pension plan is still a defined benefit plan. With cash balance plans, as with any defined benefit plans, there is a risk "that at a given time plan assets will fall short of the present value of vested plan benefits." *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 230, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (O'Connor, J., concurring). Defined benefit pension plans therefore are subject to a number of statutory requirements that do not apply to defined contribution plans. A cash balance plan must comply with these requirements because it is a defined benefit plan under the law. Most of these requirements were written between 1974 and 1984, before cash balance plans were developed and began to be widely adopted. See generally John M. Vine, *Cash Balance Plan Litigation*, 615 PLI/Lit 631 (Oct.-Nov.1999). "At that time, most pension plans were based on a formula that ex-

---

1. The plan may use a market index or other external basis to establish the rate of interest that will be credited to individual participants' hypothetical accounts. The essential point is that any such market index must lie outside the control of the employer, and it must apply regardless of actual investment performance of the plan's assets.

pressed an employee's accrued benefit, not as an account balance, but as an annuity commencing at normal retirement age." *Id.* at 634. The rules for defined benefit plans simply were not developed to address the features of cash balance pension plans. See *Esden v. Bank of Boston,* 229 F.3d at 158.

The first cash balance pension plan was established in 1985. See Lee A. Sheppard, *The Down–Aging of Pension Plans,* Tax Analysts, Inc. (1999). Cash balance plans have become increasingly popular among employers in recent years. Many employers believe that cash balance pension plans are more attractive to younger workers than traditional defined benefit plans that tend to provide the greatest benefits to long term career employees. Cash balance plans provide greater portability of benefits from one job to another over the course of a career. See *Esden v. Bank of Boston,* 229 F.3d at 158, n. 5 (summarizing benefits of cash balance plans); *Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan,* 221 F.3d at 1248 (noting that "one arguable benefit of [cash balance] plans is that they allow younger workers to take a larger benefit with them when changing jobs").

However, many older workers have resisted the conversion of their pension plans to cash balance plans. Conversions of plans can affect adversely the expectations of a generation of employees who were too young to derive much benefit from the traditional "final average pay" design, but who are too old to have gotten an early start in their careers on the benefits of a cash balance plan. This generation has essentially been getting the worst of both worlds as a result of the conversions. See generally Hope Viner Samborn, *Now You See It, Now You Don't, Older Workers Watch Pension Erode as Employers Turn to Cash–Balance Plans,* 85 Nov.-A.B.A. J. 34 (Nov.1999).

In the face of growing popularity of cash balance plans among employers and grow-

ing controversy among older workers regarding these plans, neither the IRS nor the EEOC has issued final regulations regarding the application of ERISA and the ADEA to cash balance plans. Perhaps in part as a result of this lack of guidance from the agencies, courts are now considering class action lawsuits brought by employees unhappy with their employers' decisions to convert their pension plans to a cash balance design. See *id.* (noting that conversions to cash balance pension plans "have spurred groups of older workers to file class action lawsuits alleging age discrimination and other violations of the law" and listing various lawsuits that have been filed on behalf of unhappy workers).

### III. *Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, the court should grant summary judgment if and only if the record shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). The fact that the parties have filed cross-motions for summary judgment does not alter the standard. When considering the plaintiffs' motion for summary judgment, the court must consider the evidence in the light reasonably most favorable to the defendants, and vice versa. In light of this standard, the facts set forth in this entry are either undisputed or represent the evidence of disputed facts in the light reasonably most favorable to the non-moving parties on the particular issue.

### IV. *Undisputed Facts*

#### A. *Onan and Its Prior Pension and Profit Sharing Plans*

Since 1992 Onan has been a wholly-owned subsidiary of Cummins Engine

Company, Inc. In 1952 Onan established the Profit Sharing Plan, which was a defined contribution employee pension benefit plan under ERISA. In 1976 Onan established the Onan Pension Plan, which is a defined benefit plan under ERISA.

Beginning in 1976, the Onan Pension Plan and the Profit Sharing Plan provided a "floor-offset" arrangement. Benefits for a participant in the Onan Pension Plan were calculated after taking into account the same participant's benefits earned under the Profit Sharing Plan. The Pension Plan therefore provided a minimum level of benefits available to a participant regardless of contributions to the Profit Sharing Plan or the investment return on contributions to either plan.

As originally adopted, the Onan Pension Plan used a "final average pay" design. The plan provided that a participant's accrued benefit determined as of a specified date was based on the participant's "average monthly compensation" determined as of that specified date, less 50% of the participant's "Social Security benefit" determined as of such specified date, and less the participant's Profit Sharing Plan offset. "Average monthly compensation" was based on the highest five consecutive plan years of compensation completed within the ten most recent years, which is why it can be called a "final average pay" design.

### B. *The New Cash Balance Design for the Onan Pension Plan*

In the late 1980s, Onan was advised that the Tax Reform Act of 1986, P.L. No. 99–514, 100 Stat.2085 (1986), would require changes to the integrated final average pay plans like the Onan Pension Plan that used offsets for Social Security benefits and profit sharing benefits. Maintaining the basic design and level of benefits would have increased Onan's costs substantially, by between $750,000 and $2,000,000 in the first year.

Onan began to evaluate alternative benefit formulas for the Pension Plan. Onan hired a consulting firm, Kwasha Lipton, for advice on alternative plan designs that would comply with the Tax Reform Act yet be cost neutral for Onan. After several months, Kwasha Lipton recommended a cash balance plan formula, which the firm had helped to develop and promote.

On October 27, 1989, the company's Pension Policy Committee recommended to the Onan board of directors that a cash balance formula be adopted to replace the final average pay benefit formula. More than five years later, in December 1994, the Onan board of directors formally amended the Onan Pension Plan to adopt the cash balance design retroactive to January 1, 1989.

Under the terms of the new Onan Pension Plan, each participant's accrued benefit as of December 31, 1988, under the prior final average pay formula was converted to an opening account balance for a hypothetical individual account. See Pension Plan § 3.3.[2] Thereafter, each participant's hypothetical account balance in the Pension Plan has received "pay-based credits" for each year of service, as well as interest credits, or hypothetical earnings, on those pay-based credits. Pension Plan §§ 3.2, 3.4.

A participant's service credit or pay-based credit is 2.5% of eligible compensation up to the Social Security wage base, and 4.25% of eligible compensation in excess of the wage base. Pension Plan § 3.2. Interest credits are credited to a participant's account each month. The interest credits are made at the "Inactive Interest Credit Rate" for any year in which the participant is not an employee and is not receiving benefit payments. The Inactive Interest Credit Rate is the average of the one-year Treasury bill and 30–year U.S. government bond yields for the immediate-

---

**2.** Citations in the form of "Pension Plan § —" refer to the amended Onan Pension Plan with the new cash balance design. The complete text of the plan is Exhibit 1 to the Affidavit of Lynette I. Nichols filed by plaintiffs.

ly preceding fiscal year. While the participant is still employed, the interest credits are made at the Active Interest Credit Rate, which is 2.25% higher than the Inactive Interest Credit Rate. Pension Plan § 3.4. For example, in 1994, the Inactive Interest Credit Rate was 5.25% and the Active Interest Credit Rate was 7.50%. In 1998, the Inactive Interest Credit Rate was 6.25% and the Active Interest Credit Rate was 8.50%.

The Onan Pension Plan defines a participant's "accrued benefit" in two different ways, as follows:

(a) When expressed in the form of a lump sum amount, the Participant's Account balance, as of any particular determination date (including the right to future periodic adjustments pursuant to Section 3.4 with respect to such Account balance at such determination date); and

(b) When expressed in the form of an annuity commencing on a particular determination date, the single life annuity which is the Actuarial Equivalent of the Participant's Account balance on such date.

Pension Plan § 1.2. A participant's retirement benefit is paid in its standard form as a single life annuity or, if the participant is married, a qualified joint and 50% survivor annuity. Pension Plan §§ 6.2, 6.3.

For those participants who started early enough with Onan to have also participated in the Profit Sharing Plan, the participant's retirement benefit under the amended Pension Plan is offset by the participant's profit sharing amount, just as it would have been under the prior version of the Pension Plan. The amended Pension Plan sets forth the actuarial factors used to calculate each participant's profit sharing offset. See Pension Plan, Ex. I, § 2.

The new benefit formula includes several features that protect the rights and, at least to some degree, the expectations of employees who were also participants in the pre–1989 Pension Plan. First, as required by ERISA, see 29 U.S.C. § 1054(g)(1), participants' accrued benefits under the prior version of the Pension Plan are specifically protected in the amended Pension Plan:

*No Reduction in Pre–January 1, 1989 Accrued Benefits Under Prior Plan.* In no event shall the benefits payable under this Plan to a Participant who was a participant under the Prior Plan (i) who becomes a Participant under Section 2.1(a), be less than the Actuarial Equivalent of the benefits such Participant would have received under the Prior Plan if he had ceased to be an Employee on December 21, 1988 or (ii) who becomes a Participant under Section 2.1(c), be less than the Actuarial Equivalent of the benefits to which such Participant was entitled under the Prior Plan at his termination of employment before January 1, 1989.

Pension Plan § 6.10.

Second, the Pension Plan also provides for a "minimum annuity" and a "grandfather annuity." Pension Plan, Ex. II. Neither feature was required by ERISA or any other law. These optional annuities were intended to provide participants who were also participants in the prior version of the Pension Plan with benefits comparable to those they would have been entitled to if they had retired under the prior version. Nolander Aff. ¶ 16. The minimum annuity guarantees that, in converting a participant's account balance to the accrued benefit at cessation of employment, the benefit amount will not be less than the amount of the minimum annuity. Pension Plan, Ex. II. The Pension Plan also provides that for those Plan participants who were also participants under the prior version, the benefit amount at cessation of employment shall be no less than a higher, guaranteed "grandfather annuity." *Id.* If a participant elects to receive the pension benefit as an annuity, he or she will receive the greatest of the "minimum annuity," the "grandfather annuity," or the actuarial equivalent of the individual ac-

count balance. Pension Plan, Exs. I, II. Under the Pension Plan, however, a participant is not entitled to demand a lump sum distribution based on either the minimum annuity or the grandfather annuity. Those two levels of benefits are paid only in the form of an annuity.

During November 1989, Onan conducted a series of mandatory slide presentations for all employees in small group settings to explain and answer questions about the amendments to the Pension Plan. Around the same time, Onan also distributed a brochure to each participant outlining the amendments. Onan followed-up the slide presentations with question and answer sessions, staff and team meetings, and personal meetings upon request.

In May 1990 participants received a memorandum addressing frequently asked questions about the new cash balance formula. Onan also conducted informational sessions to answer participants' questions regarding the new cash balance plan formula. In late 1990, participants also received a summary plan description setting forth the amendments to the plan. By way of a memorandum dated July 12, 1990, all participants were advised that pension estimates were available upon request. Since 1989, each participant has received an annual cash balance statement that details his or her current account balance value and, since 1992, the individual benefit payable at normal retirement age.

As late as the fall of 1994, though, Onan officials were still working to fine-tune the terms of the amended and restated Pension Plan. On October 7, 1994, Kwasha Lipton sent a draft of the amended Pension Plan document to Onan's director of compensation and benefits. The draft contained "redlining" in which the language defining "Accrued Benefit" was revised. Similarly, the definitions of "Compensation" and "Eligible Employee" were revised. Pl.Ex. 15. The final Pension Plan document was not formally executed by Onan until December 1994. See Pl.Ex. 5, ¶ 4 (Onan's Answer in related Tax Court case). As a result, the plan document setting forth the final terms of the amendments was not available for inspection by Onan's employees until late December 1994.

On March 24, 1995, Onan submitted the amended Pension Plan to the IRS District Office for approval as a qualified plan under the Internal Revenue Code, 26 U.S.C. § 401. On July 28, 1997, the IRS Employee Plan Specialist responsible for reviewing the Pension Plan notified Onan that the District Office's position was that the plan "does not satisfy the clear and straightforward requirement of section 411(b)(1)(H)(i) of the Code because the plan's benefit accrual rate decreases as a participant attains each additional year of age." Pl.App. A, Ex. 4 at 29. The IRS District Office has not issued a determination letter regarding the Pension Plan's qualification status, but has submitted the Pension Plan determination letter request to the IRS National Office for advice. *Id.* at 23.

### C. *Individual Plaintiffs and the Classes*

Plaintiff James Eaton worked for Onan from 1953 through April 5, 1995, when he retired at age 62. Eaton elected to receive his retirement benefit from the Pension Plan in the form of an annuity. He is currently receiving a monthly benefit from the Pension Plan. Plaintiff Steve Seidlitz has been employed by Onan since 1972 and is currently a participant in the Pension Plan.

Eaton and Seidlitz each filed a charge of discrimination with the EEOC on November 22, 1996, alleging that Onan's conversion of the average final pay formula to a cash balance formula violated Section 4(i) of the ADEA, 29 U.S.C. § 623(i). Plaintiffs filed their complaint in this court on May 19, 1997, alleging in relevant part the same claims set forth in their EEOC charges. Cplt., Cts. I–III. Plaintiffs then filed an Amended Complaint on July 1,

1998, adding claims that Onan, by failing to give participants the option of receiving the minimum or grandfather annuities in lump sum payments, violated Section 4(a) of the ADEA, 29 U.S.C. § 623(a). Am. Cplt., Cts. III–V. Plaintiffs' complaints also asserted claims under ERISA. Before filing their complaint, plaintiffs did not exhaust their administrative remedies under the Pension Plan's claims procedure. Am. Cplt. ¶ 53. However, plaintiffs do not contend at this point in the case that the Pension Plan has been administered contrary to its terms.

Regarding claims under the ADEA, the court entered an agreed order on November 7, 1997, defining the following plaintiff class for a collective action under 29 U.S.C. § 216(b):

> Any employee or former employee of Onan Corporation who is or was entitled to the accrual of a benefit under the Onan Pension Plan for any period after the latter of (i) December 31, 1988, or (ii) the date the participant attained age 40.

Approximately 1500 of the 2500 persons eligible to join the collective action under the ADEA have done so. Regarding claims under ERISA, the court entered an agreed order on April 7, 1998, defining the following plaintiff class under Fed.R.Civ.P. 23(b)(2):

> All persons, other than Defendants, who are or have been participants in or beneficiaries of the Onan Pension Plan at any time on or after January 1, 1988, and who have or have had a vested right to benefits from the Pension Plan.

By separate entry today, the court has denied defendants' motion to decertify the ERISA class and the ADEA collective action. Other undisputed facts are noted below as needed.

## V. Discussion

The court addresses in Part A plaintiffs' claims of age discrimination based on the rate of benefit accrual, then turns in Part B to the age discrimination claims based on the availability of lump sum distributions. The court then addresses in Part C plaintiffs' claims under ERISA, and finally deals with a few loose ends in Part D.

### A. Age Discrimination and the Rate of Benefit Accrual

#### 1. The Statutes and the Issue

Plaintiffs contend that the Onan Pension Plan violates pension age discrimination provisions enacted in Sections 9201 and 9202 of the Omnibus Budget Reconciliation Act of 1986 ("OBRA 1986"), P.L. 99–509, 100 Stat. 1874, 1973–78. Those three parallel provisions are found in the ADEA at 29 U.S.C. § 623(i), in ERISA at 29 U.S.C. § 1054(b)(1)(H), and in the Internal Revenue Code at 26 U.S.C. § 411(b)(1)(H). The ADEA provision states in relevant part:

> (i)(1) Except as otherwise provided in this subsection, it shall be unlawful for an employer, an employment agency, a labor organization, or any combination thereof to establish or maintain an employee pension benefit plan which requires or permits—
>
> > (A) in the case of a defined benefit plan, the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age, . . . .

29 U.S.C. § 623(i). The ERISA provision states that a defined benefit pension plan violates the age discrimination prohibition if, under the plan, "the rate of an employee's benefit accrual is reduced, because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H). The Internal Revenue Code provision uses the same language as the ERISA provision. See 26 U.S.C. § 411(b)(1)(H). The House Senate Conference Committee report on these three provisions stated that the conferees intended that the three provisions be "interpreted in a consistent manner and do not intend any differences in language in the provisions to create an inference that a difference exists among such provisions."

See H.R. Conf. Rep. No. 1012, 99th Cong., 2d Sess. 378–79 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3868, 4023–24.

Plaintiffs claim that the Onan Pension Plan violates the ADEA and ERISA provisions by reducing the rate of benefit accrual because of the participant's age. (Plaintiffs also believe the plan violates the parallel provision of the Internal Revenue Code, but they realize they have no standing to enforce that provision directly.) Both sides have moved for summary judgment on these claims. There are no disputed issues of material fact regarding these claims. Whether these statutes are violated does not depend on any question of intent. Plaintiffs assert their claims, and defendants defend the plan, based on objective and undisputed facts about the terms and effects of the Onan Pension Plan's cash balance design.

The dispute between the parties is one of statutory interpretation: how must a defined benefit plan participant's "rate of an employee's benefit accrual" be determined for purposes of the OBRA 1986 pension age discrimination provisions in the ADEA and ERISA? The issue has considerable practical importance. Cash balance plans have become increasingly common over the past fifteen years. If plaintiffs are correct, it is likely that hundreds of cash balance plans with millions of participants will be deemed illegal.

Plaintiffs concede that the service or pay-based credits under the Onan Pension Plan do not depend at all on a participant's age, and that the interest credits under the plan also do not depend at all on a participant's age. Plaintiffs argue that the law requires that a participant's rate of benefit accrual be measured not in terms of the current pay credits or the current interest credits, but in terms of the amount of an annual benefit beginning at normal retirement age. When the rate of benefit accrual is measured in this manner, estimates of projected future interest credits on a current year's pay credits are deemed "accrued" in the year in which the applicable

pay credit was granted. If one wants to measure a participant's accrued benefit in the form of an annuity commencing at normal retirement age, then the undisputed facts show that the participant's age must be part of the calculation. See Poulin Aff. II ¶¶ 5–8.

If plaintiffs' interpretation of the statutes is correct—if the pension age discrimination provisions required a participant's rate of benefit accrual to be measured solely in terms of the value of an annuity payable at normal retirement age—then the Onan Pension Plan, and probably any other cash balance plan, violates the OBRA 1986 pension age discrimination provisions. This effect results simply from the time value of money. All other things being equal, the service credit for a younger employee adds more to the value of an annuity payable at that employee's normal retirement age than an identical service credit for an older employee. The younger employee's service credit will earn interest credits for more years than the older employee's before each reaches the age of normal retirement. This effect is inherent in virtually any cash balance pension plan design.

Two examples under the Onan Pension Plan illustrate this basic point. Plaintiffs compare the benefits earned by two employees who began employment at Onan at the same time in 1990. See Poulin Aff. I, Ex. F. One employee is 25 years old and the other is 45 years old. Both perform the same work and both earn salaries of $30,000. See Poulin Aff. I ¶¶ 18–19 & Ex. F. In their first year of service, each employee earns a service credit of $960. *Id.* Using plaintiffs' methodology to measure the rate of benefit accrual in terms of an annuity payable at normal retirement age, the amount of each employee's service credit is projected forward to age 65 assuming an inactive interest rate of 8.75%.

For the 25 year old employee, the projected account balance from that $960 credit will grow by age 65 to $25,293.71. For the 45 year old employee, the project-

ed account balance at age 65 for that same $960 credit will be $4,725.28. When these projected account balances are converted to single life annuities at age 65, the 25 year old employee has accrued in that one year an annuity of $3,025.56, while the 45 year old employee has accrued in that same year an annuity of only $565.22. If the rate of benefit accrual is measured as a ratio of the annuity at age 65 to the employee's current compensation, the 25 year old employee's rate of benefit accrual (his "accrued benefit" divided by his salary) is 10.09%, while the 45 year old employee's rate of benefit accrual is only 1.88%.

Plaintiffs also point to the experience of "Jane Doe," a former Onan employee who was born on December 5, 1946. She began her employment with Onan on August 14, 1989, and terminated her employment on January 23, 1998. As of the date her employment terminated, Doe had an account balance under the cash balance Pension Plan equal to $5,625.85. Pl.App. A, Ex. 13. Assuming that interest rates stayed constant, that balance would continue to grow until Doe reached age 65, at which point it would pay for a normal retirement benefit payable as a single life annuity with payments of $112.28 per month, or $1,347.46 per year. *Id.* If Doe were five years younger, born on December 5, 1951, but all other aspects of her employment had been the same, she would have accrued a benefit payable as a single life annuity at age 65 with payments of $151.90 per month or $1,822.80 per year, again assuming interest rates remained constant. Poulin Aff. I ¶¶ 10–16 & Ex. E.

Defendants do not quarrel with plaintiffs' arithmetic in these examples. The effects plaintiffs describe are the obvious effects of the time value of money as applied to participants' cash balances. Instead, defendants quarrel with the statutory interpretation. Defendants contend

that the OBRA 1986 pension age discrimination provisions apply only to employees who have already passed normal retirement age, so that those provisions do not apply at all to the younger employees who have not reached normal retirement age. Defendants also argue that even if the pension age discrimination provisions do apply to benefit accruals before normal retirement age, Congress did not explicitly require, and certainly did not intend to require, that a participant's rate of benefit accrual be measured only in terms of the value of an annuity commencing at normal retirement age. Defendants suggest that the rate of benefit accrual could also be measured in terms of the change in the balance of each participant's hypothetical account, which does not depend at all on age. Defendants also contend that plaintiffs' statutory interpretation serves no apparent public policy purpose.

Plaintiffs assert that the court should apply here the parallel definitions of "accrued benefit" in ERISA and the Internal Revenue Code. For purposes of ERISA, the term "accrued benefit" means "in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in [29 U.S.C. § 1054(c)(3) ], expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(a). Similarly, section 411 of the Internal Revenue Code section states in relevant part: "For purposes of this section, the term 'accrued benefit' means—(i) in the case of a defined benefit plan, the employee's accrued benefit determined under the plan and, except as provided in subsection (c)(3), expressed in the form of an annuity beginning at normal retirement age." 26 U.S.C. § 411(a)(7)(A)(i).[3]

Thus, both of these definitions of "accrued benefit" require expression and measurement in the form of an annuity

---

**3.** The referenced exceptions in 29 U.S.C. § 1054(c)(3) and 26 U.S.C. § 411(c)(3) are not relevant here. Those parallel exceptions allow for actuarial adjustment when the accrued benefit is to be determined as an amount other than a single life annuity commencing at normal retirement age.

beginning at normal retirement age. The ERISA definition is "for purposes of this title." The Internal Revenue Code definition is "for purposes of this section," and the same section includes the prohibition in § 411(b)(1)(H) on having "the rate of an employee's benefit accrual" reduced because of the attainment of any age. Based primarily on this statutory language, plaintiffs contend that the pension age discrimination provisions *require* a measure of a participant's rate of benefit accrual in terms of an annuity payable at normal retirement age.

■ When interpreting a statute, the court's first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). The court's inquiry "must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.*, quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). In this case, however, the key statutory phrase—"rate of an employee's benefit accrual"—does not unambiguously require that the rate be measured, as plaintiffs contend, solely in terms of an annuity payable at normal retirement age. In addition, although the statutory language does not expressly limit the prohibitions to benefit accruals occurring after an employee reaches normal retirement age, there are unusually strong indications in the legislative history that Congress intended that they be so limited.

Neither the ADEA nor ERISA defines "rate of an employee's benefit accrual" specifically for purposes of applying these age discrimination provisions. Additionally, although OBRA 1986 directed issuance of "such final regulations as may be necessary to carry out the amendments made by this subtitle" no later than February 1, 1988, see P.L. 99–509 § 9204(e), neither the EEOC nor the IRS has yet issued regulations describing how the "rate of an employee's benefit accrual" for a defined benefit plan will be determined under the age discrimination provisions.

Both sides' briefs attempt to read tea leaves from various non-authoritative statements by the Department of the Treasury and the EEOC. These include preliminary decisions, proposed regulations, preambles to proposed regulations, compliance manuals, and congressional hearing testimony of agency officials. The conflicting signals only underscore the difficulty and ambiguity of the statutory interpretation problem. Cf. *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 363–64 (7th Cir.1997) ("Each side has its favorite Supreme Court case that it has flogged mercilessly to yield the desired holding."). Perhaps the most telling point is that, despite these various earlier signals, both agencies launched new efforts last year to study the question in further detail. See 64 Fed.Reg. 56578 (Oct. 20, 1999) (IRS solicits comments on cash balance conversions); Pl.App. A, Ex. 11 (Sept. 20, 1999, EEOC announcement of national study of age discrimination issues under cash balance plans).

■ When dealing with such statutory ambiguities, the courts look for guidance from many sources, including legislative history, the broader purposes of the legislation at issue, including evidence of the limitations and compromises made in Congress, as well as common sense and the practical implications of the alternative interpretations. See, *e.g.*, *Toibb v. Radloff*, 501 U.S. 157, 161, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (courts look first to statutory language and then to legislative history if statutory language is unclear); *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."); *Commissioner v. Asphalt Products Co.*, 482 U.S. 117, 121, 107 S.Ct. 2275,

96 L.Ed.2d 97 (1987) ("Judicial perception that a particular result would be unreasonable may enter into construction of ambiguous statutory provisions, but cannot justify disregard of what Congress has plainly and intentionally provided."); *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible."); *Kelly v. Wauconda Park Dist.,* 801 F.2d 269, 271–73 (7th Cir.1986) (where parties offer reasonable but conflicting interpretations of a statute's plain meaning, courts may base their conclusions on legislative history and common sense).

■ The court is persuaded that the OBRA 1986 pension age discrimination provisions do not outlaw the Onan cash balance plan. The court reaches this conclusion by two alternative and independent routes.

First, there are strong indications that the pension age discrimination provisions of OBRA 1986 do not apply at all to employees under the age of normal retirement. They were intended to ensure that employees who choose to work past the age of normal retirement continue to accrue pension benefits, albeit with some important restrictions.

Second, even if the OBRA 1986 pension age discrimination provisions do apply to employees below the age of normal retirement, the court does not believe those statutes *require* that the rate of benefit accrual be measured *solely* in terms of change in the value of an annuity payable at normal retirement age. Plaintiffs' proposed interpretation would produce strange results totally at odds with the intended goal of the OBRA 1986 pension age discrimination provisions. There is no statutory or public policy reason that the rate of benefit accrual could not be measured, at least for these purposes, in terms

of the rate of change in the balance of an employee's hypothetical account. In fact, that measure provides a precise, quantifiable, and clear measure that does not require any estimates or actuarial assumptions.

### 2. Application Before Normal Retirement Age?

Plaintiffs point out correctly that the statutory language of the OBRA 1986 pension age discrimination provisions does not specifically limit those requirements to employees who are past normal retirement age. There are strong indications in the statutes and the legislative history, however, that Congress did not intend to apply those provisions to the rate of benefit accrual for employees who have not yet reached normal retirement age.

First, the headings in OBRA 1986 lend support to this view. The heading for the Internal Revenue Code provision, 26 U.S.C. § 411(b)(1)(H), reads: "Continued accrual beyond normal retirement age." The text of OBRA 1986 includes no other headings for inclusion in the codified versions of these provisions. However, Section 9202 of OBRA 1986 includes both the ERISA and Internal Revenue Code provisions, and it is entitled "Benefit Accrual Beyond Normal Retirement Age." See 100 Stat. 1975.[4] (Section 9201 is entitled "Prohibition Against Discrimination on the Basis of Age in Employee Pension Benefit Plans," which provides no guidance on this point. See 100 Stat. 1973.) Those headings referring to accrual "beyond normal retirement age" certainly seem to indicate that the provisions were not intended to apply to employees who have not yet reached normal retirement age.

■ Statutory headings are not necessarily overwhelming or controlling indications of the meaning of statutes, of course. Nevertheless, they may provide helpful in-

---

**4.** The headings cited in this paragraph are from the United States Statutes at Large pub-
lication of OBRA 1986, P.L. 99–509.

dications of meaning. See, *e.g., Almenda-rez–Torres v. United States,* 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (heading that was consistent with legislative history was useful tool to resolve doubts about meaning); *INS v. National Center for Immigrants' Rights, Inc.,* 502 U.S. 183, 189, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) (generic reference in text of regulation to "employment" should be read as reference to "unauthorized employment" identified in paragraph's heading). Because the three provisions were all enacted together, though, it is reasonable to use the heading from the Internal Revenue Code as a clue to the meaning of all three. See H.R. Conf. Rep. No. 1012, 99th Cong., 2d Sess. 378–79 (1986) ("OBRA 1986 Conference Report"), *reprinted in* 1986 U.S.C.C.A.N. at 4023–24 (conferees intended that all three provisions be interpreted consistently, notwithstanding differences in language).[5]

The legislative history of these provisions lends powerful and explicit support to defendants' contention that the OBRA 1986 "rate of benefit accrual" provisions were not intended to be applied to employees who have not yet reached normal retirement age, but were instead intended to ensure that employees who decided to work beyond normal retirement age would continue to accrue additional retirement benefits for such service.

■ When the text of a statute is ambiguous, the most persuasive evidence of congressional intent besides the statute itself is the conference report. See *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 537 (7th Cir.1991) (interpreting meaning of "fiduciary" under ERISA: "The most authoritative form of [legislative history] is a congressional report defining the scope and meaning of proposed legislation. The most authoritative report is a Conference

Report acted upon by both Houses and therefore unequivocally representing the will of both Houses as the joint legislative body."), citing *Commissioner v. Acker,* 361 U.S. 87, 94, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959) (Frankfurter, J., dissenting); accord, *Resolution Trust Corp. v. Gallagher,* 10 F.3d 416, 421 (7th Cir.1993) (conference report is the "most persuasive evidence of congressional intent besides the statute itself"); *Monterey Coal Co. v. Federal Mine Safety & Health Review Comm'n,* 743 F.2d 589, 598 (7th Cir.1984) (explaining that conference reports "are, apart from the language of the statute itself, generally the most reliable sources of congressional intent"), citing *National Ass'n of Greeting Card Publishers v. United States Postal Service,* 462 U.S. 810, 832 n. 28, 103 S.Ct. 2717, 77 L.Ed.2d 195 (1983).

Additionally, the statements of sponsoring legislators are entitled to considerable weight. See *Monterey Coal,* 743 F.2d at 596 ("There is considerable room for disagreement about the proper treatment of a sponsor's or conferee's interpretation of a bill.... But the sponsor's or conferee's interpretation is ordinarily accorded substantial weight, at least when it is consistent with the statute and the rest of the legislative history."). Here the Conference Report and the statements of sponsors lend strong support to defendants' narrow view of the OBRA 1986 pension age discrimination provisions.

The OBRA 1986 Conference Report explained the background and terms of the legislation. The Secretary of Labor originally had authority for the enforcement of both the ADEA and ERISA, and the Secretary had issued an interpretation of these statutes that permitted employers to stop a participant's accrual of pension benefits when the participant reached the age

---

**5.** Plaintiffs assert that the heading was the result of last minute revisions of the massive OBRA 1986 bill, and they have cited "26 U.S.C. § 7506" as providing that captions and headings shall have no meaning in interpreting a statute. Pl. Reply Br. at 21 n. 16. The

cited statute deals with administration of real estate acquired by the United States. It has nothing to do with this point, and the court has not found such a provision in other sections of the Internal Revenue Code.

of 65. See OBRA 1986 Conference Report at 378, *reprinted in* 1986 U.S.C.C.A.N. at 4023. In July 1979, authority for enforcing and administering the ADEA was transferred to the EEOC. The EEOC then announced that it intended to rescind the Department of Labor's interpretation of the ADEA regarding the accrual of benefits for participants who worked past the age of 65. In March 1985, the EEOC proposed regulations that would have required that participants who chose to work past the age of 65 continue to accrue benefits. See *id.*

The Conference Report shows that Congress was addressing that issue of pension benefits of employees who continued working after they reached the age of 65. See *id.* (noting that during "the past three Congresses, bills have been introduced to require employers to continue benefit accruals and allocations"). The sponsors' statements do the same. When Senator Grassley first introduced in 1985 what became the OBRA 1986 pension age discrimination provisions, he explained: "I am introducing legislation today that would amend the Age Discrimination in Employment Act (ADEA) and the Employee Retirement Income Security Act (ERISA) to require continued pension benefit accruals for workers who work past the normal retirement age of 65." 131 Cong. Rec. 18868 (July 11, 1985). Later, speaking in support of the OBRA 1986 Conference Report, then-Representative Jeffords stated:

> [T]he bill before us is also a pension bill which extends valuable pension accrual protections to older Americans *who work beyond normal retirement age.*
>
> It is important for this body to understand what this "Older Americans Pension Benefits" provision does and does not do. What it does is prevent a covered employee pension benefit plan from eliminating or reducing an employee's pension benefit accruals, because of the attainment of any age, *for the period of employment after the employee attains*

*the normal retirement age under his or her plan.*

> This is accomplished by means of a coordinated amendment to the Age Discrimination in Employment Act (ADEA), the Employee Retirement Income Security Act (ERISA), and the Internal Revenue Code. In this coordinated fashion the amendments also make it clear that pension benefit accruals prior to normal retirement age meet the age nondiscrimination provisions if they also conform to the benefit accrual rules described in section 204 of ERISA and section 411(b) of the Internal Revenue Code.

132 Cong. Rec. 32963 (Oct. 17, 1986) (emphasis added). Representative Roukema added similar comments:

> The legislation amends current law to preclude the "attainment of any age" as a reason for eliminating or reducing pension benefits accruals after normal retirement age. Therefore, employees who want or need to continue working beyond normal retirement age will no longer be able to be treated adversely under their pension plans because of their age.
>
> The conference report on H.R. 5300 and the statement of the managers makes it clear that, with respect to benefit accruals under normal retirement age, pension plans which conform with the existing benefit accrual rules under ERISA and the Internal Revenue Code are considered to meet the new requirements. This framework provides a safe harbor for prenormal retirement age accruals for all covered pension plans....

132 Cong. Rec. 32975 (Oct. 17, 1986). Similarly, Representative Clay said that the conference committee bill would "make it clear that employee benefit plans may not reduce pension accruals or allocations on the basis of an employee's age. In short, these changes will assure that older Americans who work beyond normal retirement age continue to earn pension credits." 132 Cong. Rec. 32975 (Oct. 17, 1986). Representative Hawkins added that under the

conference committee bill, "employers [sic, should be employees] who work beyond normal retirement age will continue earning pension credit." *Id.* The quoted remarks of Representatives Jeffords, Roukema, Clay, and Hawkins all came in the form of "revised and extended remarks" not actually delivered on the floor of the House. Nevertheless, there is no indication that any other Members expressed any different views.

˙ Most important, their descriptions of the scope of the legislation are consistent with the OBRA 1986 Conference Report itself, which said *very* plainly:

> Under the conference agreement, the rules preventing the reduction or cessation of benefit accruals on account of the attainment of age *are not intended to apply in cases in which a plan satisfies the normal benefit accrual requirements for employees who have not attained normal retirement age.*

OBRA 1986 Conference Report at 379, 1986 U.S.C.C.A.N. at 4024 (emphasis added).[6]

The OBRA 1986 Conference Report also contained an example of a benefit plan that provides a benefit of $10 monthly per year of a participant's service. See *id.* at 381, 1986 U.S.C.C.A.N. at 4026. If a participant has 10 years of service at the plan's normal retirement age of 65, then the participant is entitled to receive a benefit of $100 a month if he or she retires at age 65. *Id.* The conference report explained that if the participant continued working beyond the normal retirement age of 65, "the plan is required to provide an additional benefit

of $10 per month for each year of service after age 65." *Id.* Thus, the only illustration the conference report provided was limited to protecting the rate of benefit accrual for employees who have continued to work past normal retirement age.[7]

Accordingly, both the OBRA 1986 Conference Report and the statements of legislators leading the push for these specific provisions indicate that differences in the rate of benefit accruals of those participants who had not yet reached normal retirement age would not violate the pension age discrimination provisions, at least as long as the benefit accruals satisfied the more general accrual rules of 29 U.S.C. § 1054(b) and 26 U.S.C. § 411(b). This background provides considerable support for defendants' argument that Congress did not intend for the pension age discrimination provisions to apply to the rate of benefit accrual for participants under the age of 65. In addition, this interpretation does not leave employees between the ages of 40 and 65 unprotected from age discrimination. The more general terms of the ADEA continue to bar intentional age discrimination, and all the other complex benefit accrual rules for defined benefit plans continue to apply.

3. *The Rate of Benefit Accrual Need Not Be Measured Solely In Terms of an Annuity Payable at Normal Retirement Age*

Even if the OBRA 1986 pension age discrimination provisions were deemed to apply to the rate of benefit accrual for participants who have not reached normal retirement age, these provisions do not

---

6. Plaintiffs contend this statement in the conference report refers to an earlier version of the legislation. The quoted statement appears, however, in the portion of the report describing the conference agreement, including the "certain modifications" plaintiffs have noted in their brief.

7. The conference report also included a comparison of a 45 year old employee and a 55 year old employee. See OBRA 1986 Conference Report at 379, 1986 U.S.C.C.A.N. at

4024. Plaintiffs argue that this comparison would make no sense if the OBRA 1986 provisions were limited to employees past normal retirement age. However, that comparison immediately followed and was used to illustrate the report's point that the new provisions "are not intended to apply in cases in which a plan satisfies the normal benefit accrual requirements for employees who have not attained normal retirement age." See *id.* The comparison supports defendants here, not plaintiffs.

require a measure of a participant's rate of benefit accrual that is based solely on the value of the participant's annuity payable at normal retirement age. The concept of the "benefit accrual rate" does not have a single, self-evident meaning, especially in the complex world of pension plan regulation. The term is used and defined in different ways and for different purposes under ERISA and the Internal Revenue Code.[8]

A careful examination of the practical effects of plaintiffs' method for determining a participant's rate of benefit accrual shows that the pension age discrimination provisions do not require a measure of accrued benefits based on an annuity beginning at normal retirement age.

First, as defendants point out, plaintiffs' method for determining a participant's rate of benefit accrual simply would not make sense in evaluating benefit accruals *after* normal retirement age. Plaintiffs deny that the statutes are limited to employees past normal retirement age, but they must concede that those employees were at least a major focus of the OBRA 1986 provisions. Under plaintiffs' interpretation of the statutes, however, if benefit accruals after normal retirement age must be measured in terms of annuities payable *at* normal retirement age, *i.e.*, in a year before the benefit accruals are earned, then the example in the Conference Report itself would become illegal! That example, discussed above, assumes that an employee earns a benefit of an annuity of $10 per month for every year of service. An employee with ten years of service by age 65 is entitled to receive an annuity of $100 per month beginning at age 65. The employee who continues to work past age 65 would be entitled to an annuity of $110 per month beginning at age 66, $120 per month beginning at age 67, and so on. See OBRA 1986 Conference Report at 381, 1986 U.S.C.C.A.N. at 4026.

If plaintiffs' method is applied to this example and the participant's benefit accruals are converted to an annuity payable at age 65, the participant's rate of benefit accrual measured that way inevitably decreases as the employee gets older. The reason for this decrease is merely the time value of money: an annuity of $10 per month beginning at age 65 is worth more than an annuity of $10 per month beginning at age 66. Yet the OBRA 1986 Conference Report included this example to describe the *intended* effect of compliance with the new law. Plaintiffs' interpretation would transform that example of compliance into an example of a violation. That is a strong sign that there is a problem with plaintiffs' interpretation.

---

**8.** For example, Section 401(a)(4) of the Internal Revenue Code prohibits some forms of discrimination between employees in terms of the rate of benefit accrual. The regulations interpreting that provision include some extraordinarily complex provisions and options for determining and comparing benefit accrual rates. See 26 C.F.R. § 1.401(a)(4)–3(d). Section 411(b)(1) of the Internal Revenue Code sets out in subsections (A)-(C) the anti-backloading rules for defined benefit plans, discussed in more detail below. Those anti-backloading rules take into account only benefits accrued before normal retirement age, while the anti-discrimination rules under Section 401 consider benefits accrued both before and after normal retirement age, although even those are subject to a variety of exceptions and exclusions. Similarly, ERISA requires notice of proposed plan amendments that provide for "a significant reduction in the rate of future benefit accrual." 29 U.S.C. § 1054(h). The Treasury Regulation dealing with that requirement also provides detailed and complex rules for determining the rate of benefit accrual. See 26 C.F.R. § 1.411(d)–6 Q & A–5(a)(1). Thus, defendants dispute plaintiffs' assertion that the phrases "rate of benefit accrual" or "benefit accrual rate" have one established meaning for all purposes. Defendants argue that rate of benefit accrual "is a separate term of art that has been given different meanings in different contexts." Def. Written Resp. at 2. The argument distinguishing between "accrued benefit" (defined to be measured in terms of an annuity payable at normal retirement age) and "rate of benefit accrual" may seem like pretty fine hair-splitting. Nevertheless, pension law is a highly technical field where hairs are split with ever finer razors.

Further, defendants point out correctly that cash balance plans fix the problem Congress was trying to solve in the OBRA 1986 provisions. An employee who continues to work past the normal retirement age continues to accrue pay credits (unless the plan has a lawful cap not tied to age, such as a maximum number of years of service that can be credited). She also continues to accrue interest credits on her entire cash balance, so that her benefits continue to grow beyond normal retirement age. In fact, a cash balance plan will make many such older workers better off than the law requires. Federal law allows a plan not only to suspend payment of benefits for a plan participant who works past normal retirement age, but to do so without increasing the benefits to account for the fact that they are paid later. See 29 C.F.R. § 2530.203–3.

■ Second, in trying to discern the effect of ambiguous statutory language, courts are not prohibited from considering the practical effects of alternative interpretations of that language and the public policies that would be served by those interpretations. The court has provided plaintiffs an opportunity to explain how their interpretation of the "rate of benefit accrual" would promote any public policy that Congress might have entertained or considered. Plaintiffs have not provided any answer beyond what amounted to a tautological response that Congress intended to prohibit "age discrimination." See Hearing Tr. 39–44 (discussing written question given to parties in advance of hearing).[9]

The effects of the Onan Pension Plan's cash balance design that plaintiffs attack in this lawsuit are identical to the effects of employer contributions under defined contribution pension plans. An employer's equal contributions of $1,000 per year to two employees, one age 25 and the other age 45, will have different values for those employees, at least if their values must be measured in terms of their probable value when each employee turns 65. The difference is the obvious effect of the fact that one contribution will grow for 40 years, and the other for only 20 years. The ADEA and ERISA *require* such treatment of employees of different ages in defined contribution plans, and prohibit differential treatment based on age. See 29 U.S.C. § 623(i)(1)(B) (ADEA prohibits "the cessation of allocations to an employee's account, or the reduction of the rate at which amounts are allocated to an employee's account, because of age"); 29 U.S.C. § 1054(b)(2)(A) (ERISA requires that allocations to employee's account not be ceased, nor the rate at which amounts are allocated be reduced, because of attainment of any age). It is difficult to fathom why Congress might have wanted to outlaw similar effects under defined benefit plans, and plaintiffs have offered no such reasons.

Similarly, the effects of the time value of money that plaintiffs attack in this lawsuit are also identical to the required treatment of employee contributions to defined benefit plans. See 29 U.S.C. § 1054(c)(2)(B) (accrued benefit derived from employee contributions is amount equal to employee's accumulated contributions expressed as annual benefit payable at normal retirement age); 26 U.S.C. § 411(c)(2)(B) (parallel Internal Revenue Code provision). In other words, the "accrued benefit" of a 25 year old employee's contribution of $1,000 will be far higher than the accrued benefit of a 45 year old employee's contribution of $1,000, again solely because of the time value of money.

In terms of public policy, it is also important to remember that in OBRA 1986, Congress expressly permitted the rate of

9. The court understands that plaintiffs have raised substantial public policy concerns about the conversion of traditional pension plans to cash balance designs, especially for the generation of employees who get the worst of both worlds. Issues related to plan conversions, however, are different from plaintiffs' age discrimination claims asserted here, which would effectively outlaw cash balance plans.

benefit accrual (however it is measured) to decline over time as long as the decline is tied to the participant's years of service rather than the participant's age (and despite the one-to-one correlation of age and years of service). Those pension age discrimination provisions all make clear that a defined benefit plan can even completely stop benefits from accruing to an employee if the plan has a dollar or percentage cap on benefits, or if the plan limits the number of years of service that will be counted in calculating benefits. See 29 U.S.C. § 623(i)(2); 29 U.S.C. § 1054(b)(1)(H)(ii); 26 U.S.C. § 411(b)(1)(H)(ii). In light of these effects, which are certainly legal under OBRA 1986, it remains difficult to see what public policy would be served by plaintiffs' proposed interpretation of the OBRA 1986 pension age discrimination statutes.

Further, although one should not disregard the disappointment of a generation's expectations that can occur in the transition from a final average pay plan to a cash balance design, cash balance plans offer obvious benefits to employees in terms of having more "portable" retirement benefits as job mobility increases, so that employees have the ability to build up substantial pension benefits from even (or especially) the earlier years of their working careers. Plaintiffs have offered no explanation for why Congress might have wanted to prohibit cash balance plans when it adopted OBRA 1986.

Another consequence of plaintiffs' interpretation tends to undermine that interpretation further. Under plaintiffs' method for determining a participant's rate of benefit accrual, a cash balance plan would fail the age discrimination rules simply because it *guarantees* interest credits to participants who terminate their employment prior to normal retirement age. The Onan Pension Plan, like many cash balance pension plans, provides that the employer will continue crediting interest to a participant's cash balance account after the participant stops working for the employer, and will continue to do so until the participant begins receiving benefits under the plan. Pension Plan § 3.4(a). Thus, the right to receive interest credits is not contingent on the participant's continued employment with the employer. Under plaintiffs' interpretation of "the rate of benefit accrual," the interest credits the participant receives on each pay credit he or she earns under the plan are treated as accruing in the same year as the pay credit itself, but this is true only because the interest credits are guaranteed.

By guaranteeing interest credits, the employer is protecting to some extent the value of participants' benefits from being eroded by inflation. If interest credits were conditioned on employment, a participant would not accrue interest credits in the year of the underlying pay credit, but rather year by year as the participant continued to work. If the participant chose to stop working and therefore ceased earning interest credits, and also chose to wait until retirement to begin receiving benefits, the participant would face a risk of the value of the benefits decreasing over time because of future increases in the cost of living. Adopting plaintiffs' proposed statutory interpretation would thus give employers a perverse incentive *not* to guarantee at least some level of growth in the value of a pension over time, but to leave such credits to its own discretion. That incentive would be completely at odds with sound pension policy.

■ The fact that plaintiffs' proposed interpretation of the OBRA 1986 pension age discrimination provisions has serious difficulties does not necessarily show that defendants' proposed interpretation is any better. In general terms, the rate of benefit accrual can be measured by the change in the benefit promised under the plan from one year to the next. Defendants propose, and the court agrees, that in the case of a cash balance defined benefit plan, the rate of benefit accrual should be defined as the change in the employee's

cash balance account from one year to the next. Defendants recognize that this method would not work for other defined benefit pension plans, but they suggest that it is a reasonable measure for a cash balance pension plan. The Onan Pension Plan itself defines "accrued benefit" in terms of either the participant's cash balance (changes in which do not depend at all on age), or, when expressed in the form of an annuity beginning on a particular date, the single life annuity which is the actuarial equivalent of the participant's account balance as of that date (which will be a smaller amount for a younger employee than for an older one). Either measure appears to provide a reasonable mechanism for measuring the "rate of benefit accrual" from one year to the next for purposes of the OBRA 1986 pension age discrimination provisions.

The legislative history of OBRA 1986 supports the view that methods other than looking to the value of an annuity at normal retirement age can be used to determine a participant's rate of benefit accrual under a cash plan. As discussed above, the conference report included an example of a cash balance plan that provides for an annuity of $10 per month for every year of service. An employee with ten years of service by age 65 is entitled to receive an annuity of $100 per month beginning at age 65. If the employee continued to work one more year, he would be entitled to an annuity of $110 per month. See 1986 OBRA Conference Report at 381, 1986 U.S.C.C.A.N. at 4026. The example implies that a participant's rate of benefit accrual under this plan can be measured by looking at the change in the benefit promised under the plan from one year to the next. The change in the benefit promised each year is $10, regardless of the participant's age. Thus, the Onan plan satisfies the pension age discrimination statutes, assuming they apply to employees below normal retirement age.

Finally, plaintiffs' proposed method for determining a participant's rate of benefit accrual assumes that Congress intended to require in all cases the use of a method that requires use of a reasonable actuarial assumption. As discussed above, a participant's interest credit rate varies under the Onan plan according to an outside market rate. See Pension Plan § 3.4. Because of this variable rate, the actual accrued benefit of a participant for a particular year cannot be determined with precision if it must be determined in terms of an annuity payable at normal retirement age. Instead, a reasonable assumption regarding future interest credit rates must be used to calculate a reasonable estimate of a participant's accrued benefit. It is hard to believe that, for purposes of determining whether a pension plan discriminates against participants on the basis of age, Congress would have intended to require the use of estimates based on reasonable assumptions when a much more definite method is available—the change in the cash balance in the participant's hypothetical account.

Under the Onan Pension Plan, it is possible to measure exactly the "accrued benefit" in terms of the current cash balance in a participant's "account." It is not possible, however, to measure exactly the "accrued benefit" in terms of an annuity payable at normal retirement age. To convert the current cash balance in a participant's account to an annuity payable at normal retirement age, one must estimate the future interest credits to that account through that age. The plan does not guarantee any participant any particular level of interest credits. It guarantees that the Inactive Interest Credit Rate for each year will be the average of the one-year Treasury bill rate and the 30–year Treasury bond rate for the preceding year. It also guarantees that the Active Interest Credit Rate (for participants continuing to work for Onan) will be 2.25% higher than the Inactive Interest Credit Rate. But both rates will continue to fluctuate with market conditions, and the fluctuating rates will apply to any participant's cash balance

(whether he or she continues working for Onan or not) until age 65.[10]

If the law prohibits differences in the rate of benefit accrual because of age, a measurement that permits exact comparisons, without requiring any assumptions about future interest rates, would seem to provide a better basis for comparison than a measurement that produces only estimates based on actuarial assumptions about future interest rates.

■ After considering the practical effects of plaintiffs' proposed measure of a participant's rate of benefit accrual, along with the legislative history of the pension age discrimination provisions and the statutory framework of ERISA, the court finds that the OBRA 1986 pension age discrimination provisions may permit, but do not require, a measure of a participant's rate of benefit accrual based on the value of an annuity at normal retirement age. Such a measure makes no sense when calculating the rate of benefit accrual for participants older than 65, who were the principal intended beneficiaries of the legislation. Such a measure is also contrary to the clear legislative purpose behind the OBRA legislation—to ensure that employers did not stop providing employees with pension benefits if the employees choose to work beyond normal retirement age. The undisputed facts in this case show that the Onan Pension Plan does not violate the OBRA 1986 pension age discrimination provisions. Defendants are entitled to summary judgment on plaintiffs' claims under 29 U.S.C. § 623(i) and 29 U.S.C. § 1054(b)(1)(H).

### B. Age Discrimination and the Lump Sum Distribution Issues

One feature of Onan's conversion to the cash balance plan was designed to protect, at least to some degree, the expectations of employees who had worked under the old final average pay plan. ERISA required that the annuity payable to any plan participant be not less than the participant would have received if he or she had retired at the time of the conversion to the cash balance plan. The Onan Pension Plan goes beyond that legal requirement, however, and provides that participants under the prior plan design will receive an annuity equal to the sum of that legally required amount plus "Grandfathered Pay-based credits." See Pension Plan, Ex. II. Newer participants obviously receive no benefit from that feature, which is called the "grandfather" annuity. However, all participants are also guaranteed a "minimum annuity." That feature of the plan guarantees that, in converting a participant's account balance to the accrued benefit at cessation of employment, the benefit amount will not be less than the amount of the minimum annuity. *Id.* Under the Onan Pension Plan, a participant is entitled upon retirement to an annuity based on the highest of the three formulas: the grandfather annuity (if applicable), the minimum annuity, and the cash balance of the participant's hypothetical account.[11]

The Onan Pension Plan also provides, however, that a participant who qualifies for the grandfather or minimum annuity may not choose to receive that benefit in

10. The parties have submitted some conflicting interpretations of the Onan plan as to whether a participant who leaves employment with Onan at that time "locks in" the Inactive Interest Rate that is in effect at the time of departure. Interpretation of the plan is a question of law, however. Nothing in the plan requires or allows such a "lock-in" of the interest rate. Under Section 3.4(a) of the plan, interest credits for all participants (both active and inactive) are made monthly, and they are made at the then-applicable interest rates which are adjusted each year.

11. Defendants refer to both the minimum and grandfather annuities as "subsidized annuities," although the description can be misleading. The minimum or grandfather annuities would be paid only if they were larger than the annuity that would be equivalent to the cash balance in the participant's hypothetical account. However, all benefits under any of the formulas are paid for by employer Onan.

the form of a lump sum payment that is actuarially equivalent to the annuity. The participant could choose to take a lump sum payment, but it would be only the amount in his or her hypothetical account in the cash balance plan. See Pension Plan § 6.4(a)(i).

Plaintiffs assert that the Onan Pension Plan violates the ADEA by failing to allow them to collect a lump sum payment that is actuarially equivalent to the grandfather or minimum annuities. The ADEA makes it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Plaintiffs also point out that for employees who began employment in 1989, the cash balance annuity earned that year was greater than the minimum annuity for all participants younger than age 55. For participants over age 55, however, the cash balance annuity earned that year was less than the minimum annuity. See Poulin Aff. II ¶ 13. Thus, according to plaintiffs, for the year 1989, age 55 is the "breakpoint age," or the age at which a participant's cash balance annuity becomes less than the minimum annuity. See *id.*

Because a participant's lump sum distribution is limited to the amount of his or her cash balance account, all participants older than the breakpoint age in any particular year who choose to receive a lump sum receive an amount that is the actuarial equivalent of the lowest annuity under the three alternatives. At the same time, all participants younger than the breakpoint age who choose to receive a lump sum receive an amount that is the actuarial equivalent of the largest annuity available under the three alternatives. Plaintiffs characterize this as "disparate treatment in the relationship between annuities and lump sum distributions" under the Pension Plan that "results solely from differences in the age of participants" and therefore violates 29 U.S.C. § 623(a).

In essence, plaintiffs maintain that a participant should have a right to insist on a lump sum payment that is the actuarial equivalent of the highest of the minimum annuity, the grandfather annuity, or the cash balance. Plaintiffs contend that which annuity is greater depends solely on the participant's age. The parties agree that, at least currently, participants over age 40 generally receive a larger annuity as a minimum or grandfather annuity than they would under the cash balance approach.

Defendants have moved for summary judgment on this claim, which defendants call a variation on the old adage that no good deed goes unpunished, since they were not required by law to include the grandfather or minimum annuities at all. The court agrees with that view of this claim and, as explained below, grants defendants' motion on this claim under the ADEA. As explained below in Part C, however, the court denies summary judgment for defendants on plaintiffs' parallel claim under ERISA, which presents different legal issues.

### 1. *Failure to Include the Lump Sum Issue in the EEOC Charge*

■ As a threshold matter, defendants contend the court should not reach the merits of this claim because plaintiffs did not assert it in their Charge of Discrimination filed with the EEOC.[12] In general, a claim that falls outside the scope of an EEOC charge cannot be asserted in a

---

12. Plaintiffs assert that defendants have waived this argument because they failed to assert it as an affirmative defense in their answer to plaintiffs' amended complaint pursuant to Fed.R.Civ.P. 8(c). Assuming for purposes of discussion that failure to file a timely EEOC charge is an affirmative defense subject to Rule 8(c), defendants satisfied that requirement in their answer. Defendants stated as their eleventh defense that "Plaintiffs did not file their EEOC charge in a timely manner." The court believes that allegation was sufficient to raise the defense whether plaintiffs satisfied EEOC filing requirements.

discrimination lawsuit. *Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir.1994). This requirement is not jurisdictional in nature but is a condition precedent to filing a lawsuit under the ADEA. *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 863 (7th Cir.1985). For a claim to be within the scope of the charge, there must be "a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint [must] reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek,* 31 F.3d at 500.

The EEOC charges filed by plaintiffs Eaton and Seidlitz complained that the new Onan Pension Plan violated 29 U.S.C. § 623(i) because the cash balance formula "provides each employee who is a participant with a rate of benefit accrual which decreases each year solely on account of the increase in the employee's age." On May 19, 1997, plaintiffs filed their complaint alleging that Onan violated Section 4(i) and Section 7(a) of the ADEA. On June 29, 1998, plaintiffs amended their complaint and added their Third and Fourth Claims, which seek equitable relief and compensatory damages under section 4(a) of the ADEA based on the lump sum issue.

■ The court concludes that plaintiffs' claim regarding the calculation of lump sum benefits could reasonably be expected to grow out of an EEOC investigation of plaintiffs' claim about the rate of benefit accrual under the cash balance formula. The "reasonable relationship" standard is a liberal one, designed to "effectuate the remedial purposes of Title VII [or the ADEA], which itself depends on lay persons, often unschooled, to enforce its provisions." *Babrocky v. Jewel Food Co.,* 773 F.2d at 864, citing *Jenkins v. Blue Cross Mutual Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir.1976) (*en banc*). The "reasonable relationship" standard requires "that the EEOC charge and the complaint must, at a minimum, describe the same conduct and

implicate the same individuals." *Cheek,* 31 F.3d at 501.

Plaintiffs' two ADEA claims both concern the same conduct: alleged age discrimination arising from the plan sponsor's amendment of the prior version of the Onan plan to establish a cash balance formula. Both claims focus on alleged discrimination in the calculation of pension benefits and both claims implicate the same actor, Onan Corporation. Although the EEOC charges did not specifically mention the calculation of lump sum benefits, the charges clearly informed the EEOC and the defendants that plaintiffs were concerned about age discrimination in the calculation of benefits. An investigation of plaintiffs' claims by the EEOC could reasonably be expected to include an examination of how all pension benefits were calculated under the amended plan, including lump sum determinations. The court may reach the merits of the claim.

### 2. The Merits of the Lump Sum Payment Age Discrimination Claim

■ Although plaintiffs are not precluded from bringing their claim under 29 U.S.C. § 623(a), defendants are entitled to summary judgment on the merits of the claim. No jury could reasonably find that the Onan Pension Plan's limitation on lump sum benefits to the cash balance equivalent discriminates on the basis of a participant's age.

In amending the Onan Pension Plan, defendants decided to provide minimum and grandfather annuity options in an attempt to protect the benefit expectations of those employees who had participated in the prior version of the plan. See Nolander Aff. ¶¶ 15–16. There is no reasonable doubt here that these special annuity provisions were intended primarily to *benefit* older employees, especially those who had many years of employment service under the old version of the plan, by going beyond what the law required in terms of

preserving accrued benefits under the prior version of the plan.

Plaintiffs have not identified any younger worker who would be better off in any practical way than the older workers who benefit from the grandfather and minimum annuity features in the plan. Instead, plaintiffs' theory of discrimination starts with a feature of the plan that benefits *only* older workers—the grandfather annuity. That benefit is not available or meaningful to younger workers at all. Then, because the benefit for older workers does not share every single feature with the *lesser* benefits available to both older and younger workers—*i.e.*, the ability to choose a lump sum payment for the balance of the cash balance account—plaintiffs complain of age discrimination.

In other words, the participants alleging age discrimination in the availability of lump sum benefits are the very participants who benefit from the defendants' decision to offer the grandfather and minimum annuities in the first place. If this is discrimination, it is discrimination in favor of older workers, not against them. Plaintiffs' theory of age discrimination is based on a degree of abstract formalism that completely disregards reality and requires an extraordinary form of tunnel vision. Onan was not required under federal law to provide these optional annuities at all. Its decision to do so, but without offering the lump sum payment option for these more generous benefits, does not amount to disparate treatment based on age.

To establish a cause of action under the ADEA, "a claimant must show that he was discriminated against because of his age." *Golomb v. Prudential Ins. Co. of America,* 688 F.2d 547, 550 (7th Cir.1982). The Onan Pension Plan formula here for lump sum distributions treats all participants the same, regardless of age, as each participant has the option of receiving a lump sum benefit in an amount equal to his or her cash account balance. This is not a case where the terms of a pension plan make age an express condition for receiving a certain pension benefit. See, *e.g., Solon v. Gary Community School Corp.,* 180 F.3d 844, 855 (7th Cir.1999) (early retirement incentive plan that provided teachers could retire on their 58th birthday and receive monthly payments until they reached age 62, but also provided that those who retired after their 58th birthday would receive fewer payments because payments terminated at 62, was facially discriminatory); *Huff v. UARCO, Inc.,* 122 F.3d 374, 388 (7th Cir.1997) (pension plan that required those participants age 55 and older who terminated employment to accept a payout of benefits over time instead of a lump sum distribution violated the ADEA; "This is not a case where there is merely a correlation between age and the denial of a particular benefit. [The employer's] policy draws an express line between workers over fifty-five and those under.").

Plaintiffs' theory of discrimination here is a disparate impact theory. The Seventh Circuit has clearly held that disparate impact claims are not cognizable under the ADEA. See, *e.g., Maier v. Lucent Technologies, Inc.,* 120 F.3d 730 (7th Cir.1997); *Gehring v. Case Corp.,* 43 F.3d 340 (7th Cir.1994); *EEOC v. Francis W. Parker School,* 41 F.3d 1073 (7th Cir.1994). Because plaintiffs have failed to establish a claim for disparate treatment under the ADEA regarding the calculation of lump sum benefits under the Onan Pension Plan, defendants are entitled to summary judgment on this ADEA claim, as well.[13]

---

13. In an effort to show age-based animus, plaintiffs point to a letter from Robert Byrne, Jr., an actuary for Kwasha Lipton, to Michael Paquette, Vice President of Human Resources for Onan Corporation. Pl.App. A, Ex. 6. In this letter, Byrne outlined various approaches to restructuring Onan's pension plan in light of the new government regulations. In discussing a cash balance plan, Byrne pointed out that one feature of this type of plan that "might come in handy is that it is difficult for employees to compare prior pension benefit formulas to the account balance approach." *Id.* at ON008706. There is no evidence, how-

### C. Plaintiffs' Additional ERISA Claims

Apart from the rate of benefit accrual claim addressed in Part A, plaintiffs also assert that the Onan Pension Plan's cash balance design plan violates ERISA in three other ways. First, in a claim that parallels their ADEA claim based on the lump sum issue, plaintiffs contend that the plan's failure to allow a lump sum payment option for the grandfather and minimum annuities violates ERISA. Second, plaintiffs contend the amended Onan plan violates the benefit accrual rules under ERISA and the Internal Revenue Code. See 29 U.S.C. § 1054(b)(1); 26 U.S.C. § 411(b)(1). Third, plaintiffs contend that defendants violated ERISA in calculating opening account balances for employees who were participants under the prior plan. Before addressing the merits of these claims, the court addresses defendants' affirmative defenses to these ERISA claims: failure to exhaust administrative remedies, statute of limitations, and laches. None of the defenses is persuasive.

### 1. Failure to Exhaust Administrative Remedies

Defendants argue that plaintiffs' claims under ERISA are barred because plaintiffs failed to exhaust their administrative remedies before bringing this action in federal court. ERISA requires every employee benefit plan to provide plan participants with a claims procedure that affords "a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133.

Although the statutory text of ERISA does not contain a requirement to exhaust such a claims procedure, the Seventh Circuit has recognized "that the intent of Congress is best effectuated by granting district courts discretion to require administrative exhaustion." Gallegos v. Mount Sinai Medical Center, 210 F.3d 803, 808 (7th Cir.2000), petition for cert. filed, 69 U.S.L.W. 3003 (June 27, 2000); accord, Ames v. American National Can Co., 170 F.3d 751, 756 (7th Cir.1999). "This policy of judicial administration furthers the goals of minimizing the number of frivolous lawsuits, promoting non-adversarial dispute resolution, and decreasing the cost and time necessary for claim settlement." Gallegos, 210 F.3d at 808. Requiring exhaustion also helps develop a complete administrative record for judicial review. Id.; Ames, 170 F.3d at 756.

■■■ Plaintiffs agree that they did not exhaust their administrative remedies prior to filing this action. However, the exhaustion requirement is not absolute and the court has the discretion not to enforce the requirement. See Salus v. GTE Directories Service Corp., 104 F.3d 131, 138 (7th Cir.1997) (noting that it is "within the discretion of the district courts not to require exhaustion of administrative remedies"). Courts may excuse a participant's failure to comply with the exhaustion requirement where doing so would have been futile. See, e.g., Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan, 713 F.2d 247, 254 (7th Cir.1983).

■■■ Submission of plaintiffs' ERISA claims in this case to the Onan Pension Plan's claims review procedure would have been futile, and the reasons for requiring exhaustion are not present here. Plaintiffs do not claim that defendants misapplied or misinterpreted the plan. Instead

---

ever, that Byrne was a relevant decision-maker on this matter. Moreover, the undisputed facts show that the grandfather and minimum annuity features of the cash balance plan were not required by federal law but were designed to benefit older workers by helping to protect their expectations. This general comment by someone who was not a decision-maker could not reasonably support an inference that Onan's specific decision not to make those features a little more generous for older workers, that is, the decision not to pay lump sum benefits equivalent to the minimum annuity or grandfather annuity, was the result of any animus against older workers.

they contend the plan itself violates the terms of ERISA. See *Helms v. Local 705 Int'l Bhd. of Teamsters Pension Plan,* No. 97C4788, 1998 WL 182513, at \*3 (N.D.Ill. April 16, 1998) ("Because plaintiff is arguing that the plan itself violates ERISA, . . . and not merely that the terms of the plan were misapplied, the court will excuse the exhaustion requirement on the grounds that further administrative remedies would likely have been futile."). In light of the claims being raised, there is no reason at all to expect there might be any different result through administrative review. In addition, requiring plaintiffs to exhaust their administrative remedies on these ERISA claims would not further the goals behind the exhaustion requirement of reducing the number of frivolous lawsuits, promoting dispute resolution, decreasing the cost and time of claim settlement, or developing a complete administrative record for judicial review.

### 2. *The Statute of Limitations*

Defendants also assert that plaintiffs' Seventh Claim for Relief under ERISA is barred by the statute of limitations for a breach of fiduciary duty. Plaintiffs' Seventh Claim for Relief seeks equitable relief pursuant to 29 U.S.C. § 1132(a)(3) for numerous alleged violations of ERISA. The shortest statute of limitations that could apply here is that under 29 U.S.C. § 1113, which requires a suit for breach of fiduciary duty to be brought before the earlier of six years from the date of the last action constituting the breach or three years from the earliest date the plaintiff had actual knowledge of the breach. Actual knowledge of a breach requires a plaintiff to "know of the essential facts of the transaction or conduct constituting the violation," but does not require a plaintiff "to have knowledge of every last detail of a transaction, or knowledge of its illegality." *Martin v. Consultants & Administrators, Inc.,* 966 F.2d 1078, 1086 (7th Cir.1992).

Defendants maintain that plaintiffs had actual knowledge of the facts underlying the fiduciaries' alleged violations of ERISA "no later than the end of 1987 with respect to the 1988 amendments and the end of 1989 with respect to the 1989 amendments." Def. ERISA Br. at 41–42. Defendants base these arguments on their campaign to inform and educate employees about the changes.

The problem with these arguments is that defendants did not finally and formally adopt the cash balance amendments until December 1994. Defendants have not explained how a plaintiff can be required to file a lawsuit challenging amendments to a pension plan when there is no finalized, written plan document detailing the plan amendments. From 1989 to December 22, 1994, Onan apparently was administering the Onan Pension Plan pursuant to the terms that Onan intended to adopt formally at some later time. And during that time, Onan was sharing its intentions regarding the terms of the plan with plan participants. Nevertheless, these actions by Onan do not change the fact that the terms of the plan amendments remained subject to change until they were officially adopted by Onan in December 1994. The undisputed facts show that plaintiffs had actual knowledge of defendants breach of fiduciary duty no earlier than December 1994, when Onan adopted the plan amendments at issue here. Because plaintiffs filed this action on May 16, 1997, they satisfied the three year statute of limitations under 29 U.S.C. § 1113, and their claims for breach of fiduciary duty under ERISA are not barred.

### 3. *Laches*

Defendants contend that plaintiffs' Seventh Claim for Relief is also barred by the doctrine of laches. Laches is an equitable remedy that "bars a party's rights when the party has unreasonably delayed their assertion so as to cause prejudice to the opposing party." *Hawxhurst v. Pettibone Corp.,* 40 F.3d 175, 181 (7th Cir.1994), citing *Lake Caryonah Improvement Ass'n*

*v. Pulte Home Corp.,* 903 F.2d 505, 509 (7th Cir.1990). When a defendant has asserted the defense of laches, a plaintiff has the burden of explaining its delay in bringing suit. "If the delay is excusable, the action is timely. And even if no adequate excuse is offered for the delay, the action is still viable if the defendant does not then bear its burden of showing prejudice." *Union Carbide v. State Bd. of Tax Comm'rs,* 992 F.2d 119, 123 (7th Cir.1993), citing *Zelazny v. Lyng,* 853 F.2d 540, 541 (7th Cir.1988).

Defendants contend that plaintiffs inexcusably delayed filing this action because plaintiffs were aware of the terms of the plan amendments by November 1989. Because defendants have administered the pension plan according to its amended terms for over ten years by distributing benefits and advising participants of their benefit amounts and options, defendants argue they will suffer "serious prejudice" as a result of plaintiffs' delay in filing suit.

▇ Again, however, plaintiffs cannot be faulted for not suing any earlier than December 1994, when the plan amendments were officially adopted. Plaintiffs filed this action two and a half years later, prior to the expiration of the applicable statute of limitations. In light of this sequence of events, the court finds as a matter of law that plaintiffs did not unreasonably delay in filing this lawsuit. Accordingly, the defendants' defenses to the plaintiffs' ERISA claims do not prevent the court from reaching the merits of those claims, to which the court now turns.

### 4. *Calculation of Lump Sum Distributions*

Plaintiffs allege in paragraphs 91(B) and 91(H) of their Seventh Claim for Relief that the defendants, in determining the lump sum benefits payable to Onan Pension Plan participants, have violated the valuation rules of ERISA set forth in 29

U.S.C. §§ 1053(e) and 1055(g) by failing to pay a lump sum amount equal to the present value of a participant's normal retirement benefit. Both sides have moved for summary judgment on this claim. This claim is the ERISA parallel to plaintiffs' claim of age discrimination based on the lump sum provisions discussed above, but it presents a different set of statutory and regulatory issues.

ERISA requires that all defined benefit pension plans provide participants with a nonforfeitable normal retirement benefit, or "accrued benefit." See 29 U.S.C. § 1053(a). This accrued benefit must be payable to each living participant in the form of a qualified joint and survivor annuity. 29 U.S.C. §§ 1055(a); 26 U.S.C. § 401(a)(11)(A)(i). A pension plan may also offer other optional forms of benefits.

As discussed above, the Onan Pension Plan provides benefits under three different formulas. The standard form of benefit is a single life annuity equal to the actuarial equivalent of a participant's cash balance account. See Plan §§ 6.2, 1.2b. The Pension Plan also provides for a guaranteed "minimum annuity" that is available to any employee who first participated in the Plan after 1988. Pension Plan, Ex. II. For those participants who were also participants under the earlier version of the plan, the benefit amount at cessation of employment is no less than a higher, guaranteed "grandfather annuity." *Id.*

The Pension Plan provides a participant with a benefit equal to the greatest of the benefit accruing under any of the three benefit accrual formulas. A participant who qualifies for either the grandfather annuity or the minimum annuity is therefore entitled to a normal retirement benefit that is higher than the actuarial equivalent of her account balance. Finally, the Pension Plan also provides for an optional lump sum benefit payment equal to the amount of the participant's cash balance account. See Plan §§ 6.2, 6.4(a)(i), 1.2(a).[14]

---

**14.** For the sake of simplicity, the court is disregarding additional benefit options such

as different types of survivorship annuities.

ERISA provides that if the "present value of any nonforfeitable benefit" accrued by a plan participant exceeds a specified sum, which is currently $5,000, the benefit may not be distributed as a lump sum without the consent of the participant. 29 U.S.C. § 1053(e). That section also provides that the present value of such benefit "shall be calculated in accordance with section 205(g)(3)," which sets forth specific rules for determining the present value of any accrued benefit for purposes of a lump sum distribution. See 29 U.S.C. § 1055(g)(3).

These "minimum vesting" ERISA provisions directly parallel "minimum vesting" provisions in the Internal Revenue Code. See 26 U.S.C. §§ 411(a)(11) & 417(e). Additionally, ERISA provides that regulations adopted by the Secretary of the Treasury under the parallel Internal Revenue Code provisions, 26 U.S.C. §§ 410(a), 411, and 412, shall apply to the minimum participation, vesting, and funding standards set forth in ERISA. See 29 U.S.C. § 1202(c). Plaintiffs argue that these Treasury Regulations promulgated under sections 410(a) and 411 of the Internal Revenue Code must be followed to calculate properly the amount of a participant's lump sum payment.

Treasury Regulation § 1.411(a)–11, promulgated under Internal Revenue Code § 411, provides in relevant part:

(a) Scope (1) In general. Section 411(a)(11) restricts the ability of a plan to distribute any portion of a participant's accrued benefit without the participant's consent. Section 411(a)(11) also restricts the ability of defined benefits plans to distribute any portion of a participant's accrued benefit in optional forms of benefit without complying with the specified valuation rules for determining the amount of the distribution.

\* \* \* \* \* \*

(d) Distribution valuation requirements. In determining the present value of any distribution of any accrued benefit from a defined benefit plan, the plan must take into account specified valuation rules. For this purpose, the valuation rules are the same valuation rules for valuing distributions as set forth in Section 417(e); see § 1.417(e)–1(d).

26 C.F.R. § 1.411(a)–11.

Treasury Regulation § 1.417(e)–1(d), promulgated pursuant to 26 U.S.C. § 417(e), provides in relevant part:

(d) Present value requirement. (1) General Rule. A defined benefit plan must provide that the present value of any accrued benefit and the amount ... of any distribution, including a single sum, must not be less than the amount calculated using the applicable interest rate described in paragraph (d)(3) of this section ... and the applicable mortality table described in paragraph (d)(2) of this section. *The present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit determined in accordance with the preceding sentence.*

26 C.F.R. § 1.417(e)–1(d) (emphasis added).

Plaintiffs argue that, by limiting a participant's lump sum benefit to the balance of the participant's cash balance account without allowing the participant to choose a lump sum payment based on the grandfather annuity or minimum annuity, defendants are violating the valuation requirements of 29 U.S.C. §§ 1053(e) and 1055(g), as implemented by the Treasury Regulations. Plaintiffs point out that ERISA defines a participant's "normal retirement benefit" as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." 29 U.S.C. § 1002(22). Thus, to determine a participant's "normal retirement benefit," plaintiffs contend that the amount guaranteed by the minimum annuity and the grandfather annuity must be considered, and any lump sum benefit must be actuarially equivalent to the largest applicable annuity for that participant. Under this formula, the present value of

the "normal retirement benefit" of some participants would be higher than the "balances" in their hypothetical accounts, but the plan limits any lump sum distribution to the account balance.

Defendants present several arguments in response to plaintiffs' lump sum valuation claim under ERISA. First, defendants contend that plaintiffs do not have standing to bring a claim under Treasury Regulation § 1.417(e)–1(d)(1). Defendants rely on the Seventh Circuit's holding in *Reklau v. Merchants National Corp.*, 808 F.2d 628 (7th Cir.1986), in which the court found that 26 U.S.C. § 401 and the Treasury Regulations promulgated thereunder were not enforceable by plan participants through ERISA. The court recognized that Treasury Regulations promulgated under 26 U.S.C. §§ 410(a), 411, and 412 relating to minimum participation, vesting, and funding standards are enforceable through ERISA pursuant to 29 U.S.C. § 1202(c). However, the court rejected the plaintiff's argument that, because § 401(a)(4) was "coordinated" with § 411(d)(1), it and the Treasury Regulations promulgated thereunder should also be enforceable through ERISA. The court explained that "had Congress intended that § 401 of the I.R.C. be applicable to ERISA, it would have so stated in clear and unambiguous language as it did in 29 U.S.C. § 1202(c) with §§ 410(a), 411 and 412 of the I.R.C." 808 F.2d at 631. The court also upheld the district court's finding "that § 401 of the I.R.C. does not create substantive rights under ERISA that can be enforced by an individual in a private cause of action as a participant under a tax qualified pension plan." *Id.*

■ Defendants' reliance on *Reklau* is unpersuasive here. Unlike the plaintiff in *Reklau*, plaintiffs here are not attempting to apply Internal Revenue Code provisions to ERISA that Congress did not intend be applied to ERISA. Rather, plaintiffs are relying on Treasury Regulation § 1.411, promulgated under 26 U.S.C. § 411, an Internal Revenue Code provision Congress

has specifically applied to ERISA. See 29 U.S.C. § 1202(c) (stating that regulations adopted by the Secretary of the Treasury under I.R.C. §§ 410(a), 411, and 412, shall apply to the minimum participation, vesting, and funding standards set forth in ERISA). Plaintiffs therefore have standing to bring this claim under ERISA.

■ Defendants also argue that 29 U.S.C. §§ 1053(e) and 1055(g) and Treasury Regulation § 1.417(e)–1(d) do not support plaintiffs' claim because they apply only to involuntary "automatic cashouts" of a pension plan, and not to a voluntary lump sum distributions. As discussed above, Treasury Regulation § 1.417(e)–1(d) was promulgated pursuant to 26 U.S.C § 417(e), which, like 29 U.S.C. § 1053(e), states the conditions under which a pension plan may cash out a participant's accrued benefit without the participant's consent. The Treasury Regulation specifies the factors that must be used in determining the present value of a participant's accrued benefit. The valuation requirements in Treasury Regulation § 1.417(e)–1(d) are not limited to involuntary lump sum distributions.

Defendants argue that the regulations are invalid to the extent that they apply to voluntary lump sum distributions because they extend the scope of the applicable statutes. This argument persuaded the district court in *Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan*, 66 F.Supp.2d 1328, 1334–36 (N.D.Ga. 1999). Since the hearing in this case, however, the Eleventh Circuit reversed the decision in *Lyons*, 221 F.3d 1235 (11th Cir.2000), and the Second Circuit has agreed with the Eleventh Circuit that the regulations are valid in extending the valuation requirements to voluntary lump sum distributions from defined benefit plans. *Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir.2000). Both circuits concluded that the statutory language was ambiguous in this respect and held that the regulations imposing the same valuation requirements on all lump sum distributions reflect a

reasonable executive branch interpretation of an ambiguous statute entitled to deference under the principles of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See *Lyons*, 221 F.3d at 1249; *Esden v. Bank of Boston*, 229 F.3d at 175.

This court is not inclined to disagree with the general approach taken by the Eleventh and Second Circuits, at least with respect to those who received distributions before 1995. However, questions remain as to the effect of the Retirement Protection Act of 1994, P.L. 103–465, § 767(c), which amended 29 U.S.C. § 1053(e). In *Lyons* the Eleventh Circuit recognized that the 1994 amendments might produce a different result for the validity of the regulations as applied to later retirees who received voluntary lump sum payments. See 221 F.3d at 1243 n. 12. Thus, the *Lyons* court found that a representative plaintiff who received a lump sum payment before the effective date of the 1994 amendments could not adequately represent the interests of those who might have been affected by those amendments. *Id.* at 1253. In addition, there are questions here about whether any retroactive relief would actually be warranted for any class member like Eaton, who opted to have benefits paid as an annuity rather than a less valuable lump sum. The court believes the parties are entitled to address the effects of the post-hearing decisions in *Lyons* and *Esden*, which have changed the legal landscape significantly from what was argued. Accordingly, both sides' motions for summary judgment are denied on this claim, and the court will confer with counsel to develop a plan for orderly resolution of these issues.

### 5. *Violation of Benefit Accrual Requirements*

Plaintiffs also contend that the Onan Pension Plan violates ERISA's benefit accrual rules in 29 U.S.C. § 1054(b)(1), and the parallel Internal Revenue Code provisions. Defendants have also moved for summary judgment on this claim. The court is not persuaded that defendants are entitled to summary judgment on this claim.

All defined benefit plans must satisfy one of three rules regarding accrual of benefits. See 29 U.S.C. § 1054(b)(1). In setting these accrual rules, Congress provided the "outer bounds on permissible accrual practices" for defined benefit pension plans. *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 512, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981). Two of the accrual tests, referred to by the parties as the "3% Rule" and the "Fractional Rule" pertain only to plans that take into account no more than ten years of service in calculating benefits. 29 U.S.C. § 1054(b)(1)(A) & (C). Because the Onan Pension Plan takes into account all years of service in calculating benefits, only one of the three accrual rules applies to the Plan. Referred to by the parties as the "133⅓% Rule," this rule requires that the benefits accrued by a plan participant for any plan year not be greater than 133⅓% of the benefit accrued in any prior plan year. The statute provides:

> (B) A defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133⅓ percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year. For purposes of this subparagraph—
>
> (i) any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years;
>
> (ii) any change in an accrual rate which does not apply to any individual who is

or could be a participant in the current year shall be disregarded;

(iii) the fact that benefits under the plan may be payable to certain employees before normal retirement age shall be disregarded; and

(iv) social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year.

29 U.S.C. § 1054(b)(1)(B).

Plaintiffs contend that the Pension Plan does not satisfy the 133⅓% Rule. See Poulin Aff. II, Ex. A at 11–14. They also claim that the IRS agrees with this conclusion. The IRS Key District Office that reviewed the Onan Pension Plan for compliance with 26 U.S.C. § 411(b), which is the tax code provision parallel to ERISA's accrual rules, found that the Onan plan did not meet any of the accrual tests. The IRS reiterated this position in its Answer filed in the United States Tax Court in *Arndt v. Commissioner*, Docket No. 334–99R, an action brought by another Onan employee requesting a declaration that the Onan Pension Plan is not qualified for favorable tax treatment under 26 U.S.C. § 401(a). See Pl.Ex. 4, ¶ 9ah [sic] (alleging "that the Onan Corporation Pension Plan fails to satisfy the 133⅓% rule of code section 411(b)(1)(B) for one or more plan years after 1988."). That case remains pending before the Tax Court.

Plaintiffs contend that various provisions of the Onan Pension Plan cause it to violate the 133⅓% Rule. First, plaintiffs assert that the use of the two different interest rates, the active rate for current employees and the inactive rate for all others, results in a backloading of benefits in violation of the 133⅓% Rule. See Poulin Aff. II, Ex. A, at 11–14. The Onan Pension Plan credits interest to active participants (those still employed at Onan) at a rate 2.25% higher than the interest rate credited to inactive participants' accounts. See Pension Plan § 3.4. However, plaintiffs contend, when a participant's current

year's pay credit is converted to an age 65 annuity to determine the participant's accrued benefit for that year, the inactive interest rate is used because there can be no assurance that the participant will continue to work for Onan and thus be entitled to the higher active rate in the future. According to plaintiffs, the higher interest provided by the active interest rate does not become an accrued, protected benefit and is not used until a participant completes additional years of service. In other words, the interest credited each year regarding the entire accumulated balance is treated as an accrual entirely attributable to that year. Thus, according to plaintiffs' expert Poulin, the "build up of the 2.25% interest differential in the Active Interest Credit Rate results in later years where the rate of benefit accrual exceeds the rate of benefit accrual in an earlier year by more than 133⅓%, and will fail to comply with the 133⅓ percent rule." Poulin Aff. II, Ex. A at 12–13.

The second provision of the Onan Pension Plan that plaintiffs contend also causes the Plan to violate the 133⅓% Rule is the fact that the plan provides for the accrual of benefits under three different formulas. Those are the grandfather annuity, the minimum annuity, and the hypothetical account balance. Each has a different accrual rate, see Poulin Aff. II, Ex. A at 12, but the participant's accrued benefit at any given time must be measured in terms of the highest of the three. Because of these different accrual rates, "a participant can experience a period of one or more years during which the participant will not accrue any benefit, followed by a later plan year during which the participant will accrue a benefit." *Id.* Thus, the accrual of a benefit in the later year "will exceed by infinity a zero accrual in an earlier year," causing the plan to violate the 133⅓% Rule. *Id.*

The Profit Sharing Plan offset is the third provision of the Pension Plan that plaintiffs contend causes the Plan to flunk the 133⅓% Rule. See Poulin Aff. II, Ex. A

at 13. If the amount of a participant's Profit Sharing Plan offset exceeds his or her opening account balance under the Pension Plan, the participant will have a period of time in which he or she does not accrue any additional benefits under the Pension Plan. Because an "accrual of any benefit in a later year will exceed by infinity a zero accrual in an earlier year," plaintiffs argue the Pension Plan fails to comply with the 133⅓% Rule. *Id.* Defendants point out that Revenue Ruling 76–259 states the IRS's position that compliance with the benefit accrual rules will be determined for a plan with a "floor-offset" arrangement without taking into account the offset. However, plaintiffs' argument on this claim does not depend solely on the effects of the floor-offset arrangement.

Similarly, plaintiffs argue that some participants may have an opening account balance under the Onan Pension Plan that is less than the accrued benefit the participant earned under the prior plan design. These participants may therefore accrue benefits under the Pension Plan "at a very low or zero rate of benefit accrual," followed by a later year in which they will accrue benefits at a rate that exceeds the accrual rate in the earlier year by more than 133⅓ percent. Poulin Aff. II, Ex. A at 14.

Plaintiffs also contend that the "special allocation" provided by Section 3.5 of the Onan Pension Plan to participants after they complete 30 years of service causes the plan to violate ERISA's accrual rules. "The rate of benefit accrual for a participant for the year in which the special 30–year adjustment is made will as a general matter exceed the rate of benefit accrual in any prior year by more than 133⅓ percent." Poulin Aff. II, Ex. A at 14.

 Defendants deny that the Pension Plan violates ERISA's accrual rules, and they characterize plaintiffs' claims as an attack on all backloaded pension plans. Defendants correctly point out that not all backloading of benefit accruals is prohibited by 29 U.S.C. § 1054(b), which prohibits only backloading that violates the specific accrual rules set forth in that statutory provision. Defendants contend that plaintiffs have failed to show a material issue of disputed fact as to whether the Pension Plan violates these specific accrual rules. The court disagrees, and defendants' motion for summary judgment on this claim therefore must be denied on the present record. These are issues also before the Tax Court in a related case and will require further exploration before they can be decided.

### 6. *Reasonableness of Actuarial Factors*

Before Onan converted the Pension Plan to the cash balance design, the plan worked together with the Onan Profit Sharing Plan in what is known as a floor-offset design. That is, an employee would receive a retirement benefit from the Pension Plan. That benefit from the Pension Plan could be reduced, however, based on the participant's benefits under the Onan Profit Sharing Plan. Onan stopped making any contributions to the Profit Sharing Plan after December 31, 1987, but long-time employees like Eaton and Seidlitz are also participants in that plan.

When Onan converted the Pension Plan to the cash balance design, it had to address the terms of the Profit Sharing Plan. Because Onan had stopped contributing to the Profit Sharing Plan, the Pension Plan fixed the "determination date" for the profit sharing offset at December 31, 1987, for all participants. This so-called "frozen offset" was determined, with certain adjustments, by taking into account the participant's profit sharing balance (including any withdrawals), as of December 31, 1987, but not including Onan's 1987 contribution to the Profit Sharing Plan, and then projecting the growth of that amount at an annual interest rate of 7% to the participant's normal retirement date. (The calculation is more complicated than that, but the details are not material to the issue here.)

When Onan converted the Pension Plan to the cash balance design, it amended the plan to address the effects of the Profit Sharing Plan in determining the opening account balances for those employees who were participants in both plans. The amendments called for two calculations

First, pursuant to Section 3.3 of the amended Pension Plan, defendants ascertained the amount of the participant's accrued benefit under the prior pension plan, expressed in terms of an annuity paid at normal retirement age. Defendants then converted this amount to a lump sum by using a specified annuity factor, and then discounted that lump sum at normal retirement age to present value. In performing this calculation, defendants used an interest rate of 9%, not the 7% used to calculate the profit sharing offset. See Pension Plan, App. B.

The second calculation computed a "Frozen Profit Sharing Plan Offset" for participants under the prior version of the plan who also had been participants in the Onan Profit Sharing Plan on December 31, 1987. Defendants took each participant's Profit Sharing Plan balance as of December 31, 1987, and projected that balance forward to age 65 using an interest rate of 7%. That projected balance was then converted to a projected annuity using the same annuity factor to calculate a single life annuity commencing at age 65. See Poulin Aff. II, Ex. A at 5; Pension Plan, Ex. I, § 3.

 In paragraph 91(C) of their Seventh Claim for Relief, plaintiffs allege that defendants' use of two different interest rates in discounting and inflating these two different sums over the same time period for purposes of calculating the opening account balance has resulted in a forfeiture of accrued benefits in violation of ERISA, 29 U.S.C. § 1053(a). The court is not persuaded that defendants are entitled to summary judgment on this claim.

ERISA provides that all pension plans "shall provide that an employee's right to his normal retirement benefit is nonforfeit-able upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Thus, at the time the amended Onan Pension Plan became effective on January 1, 1989, all employees who were participants in the prior version of the plan had a nonforfeitable right to the benefits they had accrued under that plan. Those accrued benefits were subject, however, to the "floor-offset" arrangement based on their profit sharing accounts.

Plaintiffs contend that the use of different interest rates in these calculations resulted in the simultaneous understatement of a participant's opening account balance under the Pension Plan and overstatement of his profit sharing plan offset. Because some plan participants therefore had an opening account balance that was less than their offset amount, they did not accrue any new benefits under the amended Pension Plan until their account balances exceeded their offset amount. See Poulin Aff. II, Ex. A at 13. Plaintiffs argue that this imbalance between the interest rates is unreasonable and resulted in a forfeiture of benefits accrued under the prior version of the plan.

Defendants argue that the use of these different interest rates is not unreasonable as a matter of law and does not result in a forfeiture of accrued benefits. Plaintiffs have produced evidence, however, showing that defendants used two different interest rates to make what was essentially the same calculation—the present value of a sum or an annuity as of the participant's normal retirement age. Plaintiffs have also shown that under certain circumstances, the use of these two different interest rates benefited the defendants at the expense of plan participants in the sense that there was a period of time during which defendants did not have to "credit" a participant's account with additional benefits. Based on the present record, the court finds there is a material issue of fact as to the reasonableness of the use of these two interest rates applied to the same time period. Defendants' mo-

tion for summary judgment is denied as to this claim.

### D. *Concluding Matters*

A few loose ends require brief attention at this point. In responding to defendants' motions, plaintiffs have withdrawn some of their claims: (1) their Sixth Claim for Relief alleging that defendants violated 29 U.S.C. § 1054(h) by failing to give plan participants the required notice with respect to the adoption of the plan amendments that took effect in either 1988 or 1989; (2) their Seventh Claim for Relief, paragraph 90, alleging that the amendment of the Pension Plan reduced participants' accrued benefits in violation of 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6); (3) their Seventh Claim for Relief, paragraph 91(E), alleging that the amended Pension Plan, in computing the beginning account balance for participants as of January 1, 1990, improperly converted the benefit accrued under the prior version of the plan into a fixed amount by failing to allow for future increases in compensation in violation of 29 U.S.C. § 1054(g); (4) their Seventh Claim for Relief, paragraph 91(G), alleging that defendants failed to credit interest in accordance with the terms of the plan; and (5) their claim in paragraph 43 of their amended complaint that defendants' incorrect calculation of participants' Social Security benefits resulted in an illegal reduction of participant's benefits under the Pension Plan. Because plaintiffs have withdrawn the above claims in response to the motion for summary judgment, they are dismissed with prejudice and plaintiffs' amended complaint is deemed amended to delete these claims. See, *e.g., Bibbs v. Newman,* 997 F.Supp. 1174, 1177 (S.D.Ind. 1998).

Additionally, in their Eighth Claim for Relief, plaintiffs contend they are entitled to additional benefits under the Pension Plan pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B). When questioned about this claim during oral argument on the pending motions for summary judgment, plaintiffs conceded that their Eighth Claim for Relief was repetitive, as it asked for relief already requested in their Seventh Claim for Relief. Thus, plaintiffs also have withdrawn their Eighth Claim for Relief, which will be deemed dismissed without prejudice.

Plaintiffs have also failed to respond to defendants' motion for summary judgment with respect to some claims that plaintiffs have asserted at earlier stages of this case. Defendants are entitled to summary judgment on those matters. Specifically, in paragraph 91(F) of their amended complaint, plaintiffs allege that the Pension Plan failed "to make benefits definitely determinable at all times" in violation of 26 U.S.C. § 401(a), and the regulations promulgated thereunder, 26 C.F.R. § 1.401-1(b). Relying on plaintiffs' response to interrogatories, defendants interpret plaintiffs' claim to be that the actuarial factors used in determining the amount of the offset attributable to a participant's Profit Sharing Plan interest were not reasonable because they allegedly were not set forth in the Pension Plan document. See Def. Discovery Ex. D, Nos. 2, 18. Plaintiffs have failed to respond to defendants' motion for summary judgment on this point, which was properly supported. On this theory, plaintiffs have failed to state a claim for relief under ERISA, and they have no standing to allege a violation of 26 U.S.C. § 401(a).

Section 401(a) of the Internal Revenue Code requires that actuarial assumptions be specified in a pension plan in order for the plan to qualify for tax exempt status. See 26 U.S.C. § 401(a). Additionally, 26 C.F.R. § 1.401-1(b)(1)(i), which was issued under section 401(a) of the Internal Revenue Code, requires pension plans to provide "definitely determinable benefits" in order to meet the requirements for special tax treatment. However, the Seventh Circuit has clearly held that 26 U.S.C. § 401(a) and the regulations promulgated pursuant to it cannot

support actions for relief under ERISA. See *Reklau v. Merchants National Corp.*, 808 F.2d 628, 631 (7th Cir.1986) (rejecting argument that requirements of 26 U.S.C. § 401(a) are "imposed on pension plans by the substantive terms of ERISA" because if Congress had so intended, "it would have so stated in clear and unambiguous language as it did in 29 U.S.C. § 1202(c) with §§ 410(a), 411 and 412 of the I.R.C."). Additionally, the Seventh Circuit has recognized that 26 U.S.C. § 401 "does not create any substantive rights that an individual can enforce as a participant or beneficiary under a tax qualified plan." *Reklau*, 808 F.2d at 630–31 (upholding district court's "refusal to find an implied cause of action under § 401 of the I.R.C."). Thus, plaintiffs have no standing to allege a violation of 26 U.S.C. § 401 or its accompanying regulations.

Defendants have also moved for summary judgment as to any claim against the Onan Profit Sharing Plan. Although plaintiffs have named the Profit Sharing Plan as a defendant in their amended complaint, plaintiffs have not made a single allegation in the amended complaint against the Profit Sharing Plan, nor do they seek relief from the Profit Sharing Plan. The Profit Sharing Plan is entitled to summary judgment on all claims.

Finally, plaintiffs requested a trial by jury on "all issues so triable." Am. Cplt. ¶ 29. Plaintiffs would be entitled to a jury trial in a trial on their ADEA claims, but the court is granting summary judgment for defendants on those claims. Defendants argue that plaintiffs' request should be denied with respect to their Seventh Claim for Relief because there is no right to a jury trial in an ERISA action. Plaintiffs have failed to respond to defendants' argument. ERISA does not address directly the right to a trial by jury. The Seventh Circuit has held that the relief available under ERISA's civil enforcement provision is equitable in nature and that claimants therefore are not entitled to a jury trial. See, *e.g.*, *Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998); *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 527 (7th Cir.1986), citing *Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820, 829 (7th Cir.1980). Plaintiffs are not entitled to a trial by jury with respect to their Seventh Claim for Relief in their amended complaint.

## VI. *Conclusion*

For the reasons set forth above, plaintiffs' motion for summary judgment is denied in its entirety. Defendants' motions for summary judgment are granted, except with respect to plaintiffs' ERISA claim challenging the determination of lump sum distributions for participants entitled to the minimum annuity or grandfather annuity, plaintiffs' ERISA claim challenging the Onan Pension Plan's compliance with the benefit accrual "backloading" provisions of 29 U.S.C. § 1054(b)(1), and plaintiffs' challenge to the calculation of opening balances for employees who were entitled to benefits under the Onan Profit Sharing Plan. The court will hold a conference on Friday, October 20, 2000, at 9:30 a.m. to establish a schedule for resolving those remaining issues.

So ordered.